**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.:**

SECURITIES AND EXCHANGE COMMISSION,   )
                                       )
     **Plaintiff,**      )
                                       )
v.                                     )
                                       )
BARRY M. KORNFELD,                     )
FERNE KORNFELD,                        )
FEK ENTERPRISES, INC., d/b/a FIRST FINANCIAL TAX )
GROUP,                                 )
ANDREW G. COSTA,                       )
COSTA FINANCIAL INSURANCE SERVICES, CORP., )
ALBERT D. KLAGER, and                  )
ATLANTIC INSURANCE & FINANCIAL SERVICES, INC., )
                                       )
     **Defendants.**     )
_____)

**COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**

Plaintiff Securities and Exchange Commission ("Commission") alleges:

**INTRODUCTION**

1. From at least April 2013 through December 2017, the Defendants in this action served as unregistered brokers on behalf of Woodbridge Group of Companies LLC and its affiliates ("Woodbridge"), raising almost $100 million from the offer and sale of unregistered securities to over 1,100 retail investors located throughout the United States. The Defendants, all based in Florida, collectively earned more than $5.8 million in transaction-based sales commissions.

2. The Defendants utilized several marketing techniques, including advertising on television, radio, newspapers, email, social media, and pitching investors at in-person meetings and investment seminars, routinely touting Woodbridge's securities as "safe and secure."

3. Unbeknownst to the Defendants' customers, many of whom had invested their retirement savings in response to the Defendants' marketing techniques, Woodbridge was actually operating a massive Ponzi scheme, raising more than $1.2 billion before collapsing in December 2017 and filing for bankruptcy. Once Woodbridge filed for bankruptcy, investors stopped receiving their monthly interest payments, and have not received a return of their investment principal.

4. At all relevant times, the Defendants held no securities licenses, were not registered with the Commission, and were not associated with registered broker-dealers, nor did they qualify for an exemption. The Defendants were thus not permitted to sell securities. In addition, Defendant Barry M. Kornfeld was subject to a Commission order barring him from associating with a broker.

5. By engaging in this conduct the Defendants each violated Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act"), [15 U.S.C. §§ 77e(a) and 77e(c)], and Section 15(a)(1) of the Securities Exchange Act of 1934 ("Exchange Act"), [15 U.S.C. § 78o(a)(1)]. Defendant Barry M. Kornfeld also violated Section 15(b)(6)(B)(i) of the Exchange Act, [15 U.S.C. § 78o(b)(6)(B)(i)]. Unless enjoined, the Defendants are reasonably likely to continue to violate the federal securities laws. The Commission also seeks against all Defendants disgorgement of ill-gotten gains along with prejudgment interest thereon, and civil money penalties, and against Barry M. Kornfeld a conduct based injunction prohibiting him from participating in securities transactions except for his own benefit, and for an Order of Compliance, requiring him to comply with the provisions of the Commission's prior industry bar against him in 2010.

**DEFENDANTS**

6. **Barry M. Kornfeld**, 55, is a resident of Parkland, Florida and is the Co-President of FEK Enterprises, Inc. d/b/a First Financial Tax Group ("First Financial"). Kornfeld is not currently registered with the Commission, the Financial Industry Regulatory Authority ("FINRA") or any state securities regulatory authority, nor was he during the time period relevant to the allegations contained herein. From at least July 2014 to October 2017, Barry Kornfeld personally solicited and sold unregistered Woodbridge securities to retail investors in at least a dozen states.

7. On May 28, 2009, in *SEC v. William Betta, Jr., et al.,* No. 9:09-cv-80803-KAM (S.D. Fla. 2009), the Commission filed an action against Barry M. Kornfeld alleging that, while engaged as a registered representative of a dually registered broker-dealer and investment adviser, Barry M. Kornfeld made fraudulent misrepresentations to his retail customers about the safety and security of mortgage-backed securities he sold to them. On September 9, 2009, a judgment was entered by consent against Barry M. Kornfeld, permanently enjoining him from future violations of the anti-fraud provisions of the Securities Act and the Exchange Act. The Commission thereafter instituted settled administrative proceedings against him pursuant to Section 15(b)(6) of the Exchange Act and Section 203(f) of the Investment Advisers Act of 1940 imposing a permanent associational bar, barring Kornfeld from association with any broker, dealer, or investment adviser. *See In the Matter of Barry M. Kornfeld,* Exchange Act Rel. No. 62466 (July 7, 2010). In relation to the same misconduct, Barry M. Kornfeld consented to the entry by FINRA of a permanent bar from association with any FINRA member in all capacities. *See* FINRA Case No. 2007009594001 (Dec. 16, 2008).

8. **Ferne E. Kornfeld**, 64, is a resident of Parkland, Florida, and the Co-President of First Financial, which she co-owns with her husband, Barry M. Kornfeld (collectively Ferne and Barry M. Kornfeld are referred to as the "Kornfelds"). Ferne Kornfeld is not currently registered with the Commission, FINRA or any state securities regulatory authority, nor was she from October 2015 through October 2017. From at least July 2014 to October 2017, Ferne Kornfeld personally solicited and sold unregistered Woodbridge securities to retail investors in at least a dozen states.

9. **First Financial** is a Florida corporation with offices in Boca Raton and Boynton Beach, Florida, owned and controlled by the Kornfelds, engaged in the business of selling investment products, including Woodbridge's securities, to retail investors. First Financial has never been registered with the Commission, FINRA or any state securities regulatory authority.

10. **Andrew G. Costa,** 68, is a resident of Fort Lauderdale, Florida, and is the President and beneficial owner of Costa Financial Insurance Services Corp. ("Costa Financial"). Costa is not currently registered with the Commission, FINRA or any state securities regulatory authority, nor was he during the time period relevant to the allegations contained herein. On March 3, 2008, without admitting or denying FINRA's findings, Costa and the Boca Raton, Florida registered broker-dealer he beneficially owned, Costa Financial Securities, Inc., consented to a Letter of Acceptance, Waiver and Consent expelling him from membership with FINRA and permanently barring him from associating with any FINRA member in any capacity. From at least June 2014 to December 2017, Costa personally solicited and sold unregistered Woodbridge securities to retail investors in at least six states.

11. **Costa Financial** is a Florida corporation with offices in Fort Lauderdale, Florida, owned and controlled by Costa, engaged in the business of selling investment products,

including Woodbridge's securities, to retail investors. Costa Financial has never been registered with the Commission, FINRA or any state securities regulatory authority.

12. **Albert D. Klager,** 60, is a resident of Vero Beach, Florida, and is the President and beneficial owner of Atlantic Insurance & Financial Services, Inc. ("Atlantic"). Klager is not currently registered with the Commission, FINRA, or any state securities regulatory authority, nor was he during the time period relevant to the allegations contained herein. From at least April 2013 through December 2017, Klager personally solicited and sold unregistered Woodbridge securities to retail investors in at least eight states.

13. **Atlantic** is a Florida corporation with offices in Vero Beach, Florida, owned and controlled by Klager, engaged in the business of selling investment products, including Woodbridge's securities, to retail investors. Atlantic has never been registered with the Commission, FINRA or any state securities regulatory authority.

## JURISDICTION

14. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d) and 77v(a)]; and Sections 21(d), 21(e) and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa(a)].

15. This Court has personal jurisdiction over the Defendants and venue is proper in the Southern District of Florida. The Defendants reside in the Southern District of Florida and transacted business in this district. In addition, several hundred of the Defendants' clients who invested in the Woodbridge's securities reside in the Southern District of Florida, and these clients invested millions of dollars in these securities.

16. In connection with the conduct alleged in this Complaint, Defendants, directly and indirectly, singly or in concert with others, made use of the means or instrumentalities of

interstate commerce, the means or instruments of transportation or communication in interstate commerce, and of the mails.

## FACTUAL ALLEGATIONS

17. Beginning in July 2012 through at least December 4, 2017, Robert H. Shapiro ("Shapiro") and Woodbridge orchestrated a massive Ponzi scheme raising in excess of $1.22 billion from the sale of unregistered securities to over 8,400 investors nationwide. At least 2,600 of these investors used their Individual Retirement Account funds to invest nearly $400 million. The Defendants, all based in Florida, are collectively responsible for raising almost $100 million from investors.

### A. Woodbridge's Securities and Representations to Investors

18. Woodbridge sold investors two primary types of securities: (1) twelve-to-eighteen month term promissory notes bearing 5%-8% interest that Woodbridge described as First Position Commercial Mortgages ("FPCM Note" and "FPCM Investors"), which were issued by one of Woodbridge's several affiliated Fund Entities, and (2) seven different private placement fund offerings with five-year terms: (a) Woodbridge Mortgage Investment Fund 1, LLC; (b) Woodbridge Mortgage Investment Fund 2, LLC; (c) Woodbridge Mortgage Investment Fund 3, LLC; (d) Woodbridge Mortgage Investment Fund 3A, LLC; (e) Woodbridge Mortgage Investment Fund 4, LLC; (f) Woodbridge Commercial Bridge Loan Fund 1, LLC; and (g) Woodbridge Commercial Bridge Loan Fund 2, LLC; (collectively "Fund Offerings" and "Fund Investors").

#### 1. FPCM Notes

19. Woodbridge represented that the FPCM Note was a "simple, safer and more secured opportunity for individuals to achieve their financial objectives." The purported revenue

source enabling Woodbridge to make the payments to FPCM Investors was the interest Woodbridge would be receiving from mainly one-year loans to supposed third-party commercial property owners ("Third-Party Borrowers"). Woodbridge told investors that these Third-Party Borrowers were paying Woodbridge 11-15% annual interest for "hard money," short-term financing. Woodbridge would secure the debt through a mortgage on the Third-Party Borrowers' real estate. For example, Woodbridge wrote in marketing materials that "Woodbridge receives the mortgage payments directly from the borrower, and Woodbridge in turn delivers the loan payments to you under your [FPCM] documents."

20. Woodbridge provided FPCM Investors three primary documents: (1) a promissory note payable by a Woodbridge entity; (2) a collateral assignment of note and mortgage, purportedly providing a security interest in Woodbridge's right, title and interest in the loan for the property, the promissory note evidencing the pledged loan, and the mortgage or deed of trust securing the loan with an interest in the property; and (3) an inter-creditor agreement, necessary because Woodbridge allowed multiple investors (generally unknown to each other) the opportunity to invest in notes secured by the same properties. Woodbridge promised FPCM Investors a pro-rata first position lien interest in the underlying property.

21. The FPCM Investors invested their funds with the expectation of earning the promised returns while maintaining a secured interest in a parcel of real estate.

22. The profitability of the FPCM investments was derived solely from the efforts of Shapiro and Woodbridge and the investments were in a common enterprise. Once investors provided their funds to Woodbridge, their funds were commingled with other investors' funds and used by Woodbridge for general business purposes. Investors had no control over how Shapiro and Woodbridge used their money. Because Woodbridge was a Ponzi scheme, its

ability to pay returns depended upon its continued ability to raise funds from new investors and convince existing investors to rollover their investments. Information materials from Woodbridge informed investors that it conducted all due diligence including title search and appraisal on the commercial property and borrower. The investors played no role in selecting which properties would purportedly secure their investments. Marketing materials from Woodbridge also reassured investors, telling them not to worry about borrowers failing to make their loan payments because Woodbridge would continue to pay investors their interest payments.

### 2. Fund Offerings

23. Woodbridge offered the Fund Offerings to investors through one of its affiliated Fund Entities, pursuant to purported exemptions from registration under Rules 506(b) and (c) of Regulation D of the Securities Act, collectively seeking to raise at least $435 million from investors. In the Regulation D filings, Woodbridge described the Fund Offerings as "equity" securities.

24. Woodbridge, in an attempt to avoid registration of its securities with the Commission, purportedly limited each of the Fund Offerings to accredited investors with a $50,000 minimum subscription and provided for a five-year term with a 6% to 10% aggregate annual return paid monthly to Fund Investors and a 2% "accrued preferred dividend" to be paid at the end of the five-year term and a share of "profits." Neither Woodbridge nor the Defendants ensured that only accredited investors purchased the Fund Offerings (or the FPCMs).

25. In the offering memoranda for the Fund Offerings, Woodbridge represented to Fund Investors that their funds would be used for real estate acquisitions and investments,

8

notably including Woodbridge's FPCMs. The Fund Offerings, in effect, were investments into pooled FPCMs. Many of these pools contained 40 or more investors.

26. Investors in the Fund Offerings invested in a common enterprise with the expectation of profit based on the efforts of others. The allegations of paragraph 21 and 22 of this Complaint are applicable to the Fund Offerings as well.

27. The FPCM Notes and the Fund Offerings are securities within the meaning of Securities Act § 2(a)(1), 15 U.S.C. § 77b(a)(1), and Exchange Act § 3(a)(10), 15 U.S.C. § 78c(a)(10). Investors were unquestionably motivated by the high rate of returns that Woodbridge offered and investors viewed these as passive investments generating safe returns. Woodbridge sold the FPCM notes to a broad segment of the public (at least 8,400 investors) through general solicitations and there were no risk-reducing factors indicating the FPCM notes were not securities. Neither the FPCM Notes nor the Fund Offerings were registered with the Commission, and there was no applicable exemption from registration.

### B. Woodbridge's Misrepresentations

28. Woodbridge's claim to be making high interest rate loans to "third party" borrowers was a lie. In reality, Woodbridge's business model was a sham. Investors' funds were used to purchase, in the name of a Shapiro controlled Limited Liability Company (LLC), almost 200 residential and commercial properties, primarily in Los Angeles, California and Aspen, Colorado. Thus, nearly all the "third-party" borrowers were Shapiro owned and controlled LLCs, which had no source of income, no bank accounts, and never made any loan payments to Woodbridge, all facts Woodbridge and Shapiro concealed from investors.

29. Because Shapiro's LLCs were not making any of the promised interest payments and Woodbridge's other revenue was minimal, Woodbridge sought to convince FPCM Investors

9

to rollover their investment into a new note at the end of the term, so as to avoid having to come up with the cash to repay the principal. For the payment of returns to FPCM and Fund Investors and redemptions to FPCM Investors who did not rollover their notes, Woodbridge raised and used new investor funds, in classic Ponzi scheme fashion.

30. Finally, on December 1, 2017, after amassing more than $1.22 billion of investor money, with more than $961 million in principal still due to investors, Woodbridge and Shapiro missed their first interest payments to investors after purportedly ceasing their fundraising activities. Without the infusion of new investor funds, just days later, on December 4, 2017, Shapiro caused most of his companies to be placed in Chapter 11 Bankruptcy.

31. In the Chapter 11 Bankruptcy, Woodbridge, now under the control of independent management, has taken the position that the FPCM Investors do not have a secured interest in the property underlying their investment because they were required to perfect their interest pursuant to the requirements of the Uniform Commercial Code, which virtually none of the investors did.

### C. Defendants Offered and Sold Woodbridge Securities

32. Woodbridge recruited a network of several hundred external, mostly unregistered, sales agents, including the Defendants. Woodbridge provided the Defendants with the information and marketing materials that the Defendants gave to FPCM and Fund Investors.

33. Using the Woodbridge-provided materials, the Defendants solicited the general public via various means, as detailed below, in conjunction with email, telephonic, and in-person solicitations and meetings. For example:

- Costa conducted a radio program several days per week where he often pitched the FPCM note program, and directed his clients to Woodbridge's website and provided his clients with printouts from Woodbridge's website.

10

- Defendant Klager and his company Atlantic, Costa and his company Costa Financial, and the Kornfelds and their company First Financial advertised the FPCM note program in newspapers. The Kornfelds and Klager also advertised FPCMs on their websites, fftaxgroup.com and askatlantic.com, respectively.

- Klager and the Kornfelds conducted lunch and dinner seminars for the general public, often enlisting their respective Woodbridge internal sales representative to help pitch the Woodbridge securities at these meetings.

- The Kornfelds taught a "conservative retirement, income planning and social security" class at Florida Atlantic University, located in Boca Raton, Florida, where they promoted the FPCM note program and solicited prospective investors.

34. Once in contact with a potential investor, the Defendants assured the safety and profitability of the Woodbridge investment. The Defendants touted the purported security of the properties the investments were tied to by virtue of their favorable loan-to-value ratios, Woodbridge's long tenure and track record in the industry, the purported first-position lien the investors would have on the properties in the event of a default by the "third party" borrower, and assured investors that an investment in Woodbridge was a more profitable alternative than traditional investments such as bank certificates of deposits, and safer than the stock market.

35. If a customer decided to invest in the FPCM note program, the Defendants filled out a Woodbridge online form identifying their customer, the amount of investment (with the minimum being $25,000), and selecting the Woodbridge property that would purportedly collateralize the customers' note. (The Defendants would often select the property without customer input, frequently just checking a box for their customer to receive the next available property without knowing anything about it). Woodbridge's processing department then

generated a loan agreement and promissory note and sent the documents to the Defendants. Investors typically provided the Defendants the signed documents and the check for their principal investment, and the Defendants returned the package to Woodbridge. The investor then received monthly interest payments directly from Woodbridge.

36. Woodbridge offered its FPCM notes to Defendants at a 9% wholesale annual interest rate, who then would offer these notes to their investor clients at 5% to 8% annual interest rate—the difference representing the Defendants' transaction-based commission.

37. For the Fund Offerings, each of the Defendants received a 5% sales commission that Woodbridge purposefully mischaracterized as a "marketing bonus" to avoid the appearance of paying transaction-based commissions.

38. The Defendants encouraged their customers to rollover their investments at their term expiration, either into another 12-18 month FPCM note, or into a five-year Fund Offering. Defendants received transaction-based commissions for rollovers, with a five-year Fund Offering rollover receiving a greater commission than a FPCM rollover.

39. Overall, Woodbridge collectively paid the Defendants more than $5.8 million in transaction-based sales commissions through this arrangement, as follows:

- Barry M. Kornfeld, Ferne Kornfeld, and First Financial: From July 2014 through October 2017 – approximately $3.7 million in transaction-based commissions earned as a result of raising more than $60 million from almost 500 investors;

- Klager and Atlantic: From April 2013 through December 2017 – approximately $1.4 million in transaction-based commissions earned as a result of raising more than $23 million from approximately 535 investors; and

- Costa and Costa Financial: From June 2014 through December 2017 -- approximately $735,000 in transaction-based commissions earned as a result of raising more than $13 million from approximately 76 investors.

40. During the time they sold Woodbridge securities, the Defendants were neither registered broker-dealers nor associated with registered broker-dealers.

41. Barry M. Kornfeld had been previously barred by the Commission from associating with any broker-dealer and barred by FINRA from association with any FINRA member in all capacities. The actions taken by Barry M. Kornfeld as described in this Complaint violate the Commission's order barring him from association with any broker-dealer.

## CLAIMS FOR RELIEF

## COUNT I

## Violations of Sections 5(a) and 5(c) of the Securities Act

### (As to all Defendants)

42. The Commission repeats and realleges paragraphs 1 through 41 of this Complaint as if fully set forth herein.

43. No registration statement was filed or in effect with the Commission pursuant to the Securities Act with respect to the securities offered and sold by the Defendants as described in this Complaint and no exemption from registration existed with respect to these securities.

44. From as early as April 2013 and continuing through approximately December 2017, the Defendants directly and indirectly:

    (a) made use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell securities, through the use or medium of a prospectus or otherwise;

  (b)  carried or caused to be carried securities through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or delivery after sale; or

  (c)  made use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security;

without a registration statement having been filed or being in effect with the Commission as to such securities.

  45.  By reason of the foregoing the Defendants violated and, unless enjoined, are reasonably likely to continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## COUNT II

### Violations of Section 15(a)(1) of the Exchange Act

### (As to all Defendants)

  46.  The Commission repeats and realleges Paragraphs 1 through 41 of this Complaint as if fully set forth herein.

  47.  From as early as April 2013 and continuing through approximately December 2017, the Defendants, directly or indirectly, by the use of the mails or the means or instrumentalities of interstate commerce, while acting as or associated with a broker or dealer, effected transactions in, or induced or attempted to induce the purchase or sale of securities, while they were not registered with the Commission as a broker or dealer or when they were not associated with an entity registered with the Commission as a broker-dealer.

  48.  By reason of the foregoing, the Defendants, directly or indirectly, violated and, unless enjoined, are reasonably likely to continue to violate Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

14

## COUNT III

## Violations of Section 15(b)(6)(B)(i) of the Exchange Act

**(As to Barry M. Kornfeld Only)**

49. The Commission repeats and realleges Paragraphs 1 through 41 of this Complaint as if fully set forth herein.

50. From July 2014 through at least October, 2017, the Defendant willfully became, or was associated with, a broker-dealer, in contravention of the Commission's Order permanently barring Kornfeld from association with any broker, dealer, or investment adviser, in *In the Matter of Barry M. Kornfeld,* Exchange Act Rel. No. 62466 (July 7, 2010).

51. By reason of the foregoing, the Defendant, directly or indirectly, violated and, unless enjoined, is reasonably likely to continue to violate, Section 15(b)(6)(B)(i) of the Exchange Act [15 U.S.C. § 78o(b)(6)(B)(i)].

## RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests the Court find the Defendants committed the violations alleged, and:

### A.
### Permanent Injunctive Relief

**(As to All Defendants)**

Issue a Permanent Injunction restraining and enjoining all Defendants from violating Sections 5(a) and 5(c) of the Securities Act and Section 15(a)(1) of the Exchange Act.

### B.
### Permanent Injunctive Relief

**(As to Barry M. Kornfeld Only)**

Issue a Permanent Injunction restraining and enjoining Defendant Barry M. Kornfeld from violating Section 15(b)(6)(B)(i) of the Exchange Act.

### C.
### Conduct Based Injunction

**(As to Barry M. Kornfeld Only)**

Enter an Order prohibiting Defendant Barry M. Kornfeld from, directly or indirectly, including through any entity he owns or controls (1) participating in the issuance, offer, purchase or sale of any securities except for transactions involving his own personal brokerage account and (2) participating in the management, administration, supervision of, or otherwise exercising any control over, any commercial enterprise or project that issues, purchases or sells securities.

### D.
### Compliance with Order of the Commission

**(As to Barry M. Kornfeld Only)**

Enter an order, pursuant to Section 21(e) of the Exchange Act, requiring Defendant Barry M. Kornfeld to comply with the provisions of the Commission's Order, permanently barring Kornfeld from association with any broker, dealer, or investment adviser. *See In the Matter of Barry M. Kornfeld,* Exchange Act Rel. No. 62466 (July 7, 2010).

### E.
### Disgorgement and Prejudgment Interest

**(As to All Defendants)**

Issue an Order directing the Defendants to disgorge all ill-gotten gains or proceeds received as a result of the acts and/or courses of conduct complained of herein, with prejudgment interest thereon.

### F.
### Civil Money Penalties

**(As to All Defendants)**

Issue an Order directing the Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act and Section 21(d) of the Exchange Act.

### G.
### Further Relief

Grant such other and further relief as may be necessary and appropriate.

### H.
### Retention of Jurisdiction

Further, the Commission respectfully requests that the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that it may enter, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

## **DEMAND FOR JURY TRIAL**

The Commission hereby demands a trial by jury on any and all issues in this action so triable.

August 20, 2018

Respectfully submitted,

By: */s/ Russell Koonin & Christine Nestor*
Russell Koonin & Christine Nestor
Senior Trial Counsel
kooninr@sec.gov; nestorc@sec.gov
FL Bar No.: 474479; FL Bar No. 597211
Telephone: (305) 982-6385; (305) 982-6367

*/s/ Scott Lowry*
Scott Lowry
Senior Counsel
lowrys@sec.gov
Special Bar ID # A5502400
Telephone: (305) 982-6387

Attorneys for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
Telephone: (305) 982-6300
Facsimile:  (305) 536-4154