**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

**CASE NO. 18-cv-23369-MORENO/GOODMAN**

SECURITIES AND
EXCHANGE COMMISSION,

      Plaintiff,

v.

BARRY KORNFELD, et al.,

      Defendants.

_____/

**REPORT AND RECOMMENDATIONS ON SEC'S MOTION
FOR A SHOW CAUSE ORDER ON WHY DEFENDANT ANDREW COSTA
<u>SHOULD NOT BE HELD IN CONTEMPT</u>**

Defendant Andrew Costa was an unregistered sales agent for Woodbridge Group of Companies, LLC, which operated a Ponzi scheme selling more than $1.22 billion in unregistered transactions. Costa sold unregistered securities to retail investors in at least six states. The Court entered Final Judgement against him in May 2019, ordering him to pay $794,330 in disgorgement and prejudgment interest and a $100,000 penalty. Costa has paid none of that. He does, however, live with his wife in a lien-free, 3,000-foot Fort Lauderdale home worth approximately $1.9 million and which he and his wife transferred to a trust by quitclaim deed two days after the SEC sued Woodbridge.

Costa says he has no assets other than a 2015 Ford Explorer to pay the judgment.

1

He says that Social Security is his sole source of income and that the home (in which he used to be a joint owner) is no longer his to use for judgment-payment purposes.

Arguing that Costa's professed inability to pay the disgorgement is a self-created scenario, the SEC asks the Court to require him to pay the judgment and, if Costa fails to comply, to impose civil contempt, including incarceration.

Costa opposes the SEC's motion, arguing that the real estate had been held jointly by him and his wife for 40 years in a tenancy by the entirety, which made it exempt from collection under state law. Therefore, he says, the quitclaim deed transfer was not designed to shelter his assets from the SEC (because it was *already* exempt as entireties property). And he explains away a false, under-oath answer in a bankruptcy proceeding (in which he denied transferring the property) as one given without the benefit of counsel and the result of confusion.

The SEC argues that Costa's credibility about his false declaration in the bankruptcy proceeding is problematic, and it contends that the Court has the power to reject state law exemptions when enforcing a federal court disgorgement order. It wants the Court to use its contempt power to pressure Costa into making payment, for the ultimate benefit of the fraud victims.

For the reasons outlined below, the Undersigned **respectfully recommends** that the Court **grant** the SEC's motion for a show cause order, [ECF No. 38] require Costa to pay the judgment within 90 days, and to hold him in civil contempt if he does not make

the payment or demonstrate that payment arrangements are under way (such as a signed contract for the sale of the house with a closing date in 100 days or a commitment letter from a bank which authorized a loan -- using the house as collateral – after an appraisal scheduled a few days after expiration of the 90-day period).

This recommendation does not specify the *precise* steps which Costa must take to pay the judgment. He can arrange for his wife to sell the home and use some of the sale proceeds to pay the judgment. He can convince his wife to use the home as collateral for a loan and use some of the loan proceeds to pay the judgment. Or he can explore other alternatives. What he cannot do, however, is continue to avoid his payment obligation while living in an unencumbered $1.9 million home which the Court is able to reach to enforce a disgorgement order (by rejecting state law exemptions typically available when other types of creditors seek to enforce a garden-variety judgment).

## I.     Factual and Procedural Background

### *General Background*

From July 2012 to December 2017, Woodbridge and its CEO/Owner, Robert Shapiro, operated a massive Ponzi scheme selling more than $1.22 billion in securities in unregistered transactions through in-house sales staff and a network of external unregistered sales agents. From at least June 2014 to December 2017, Costa was one of these unregistered sales agents for Woodbridge and personally solicited and sold unregistered Woodbridge securities to retail investors in at least six states. The Court

entered Final Judgment against Costa in May 2019, ordering him to pay $794,329.97 in disgorgement and prejudgment interest and a penalty of $100,000. Costa has not made any payments towards these obligations.

### Woodbridge Ponzi Scheme

Woodbridge sold investors two primary products, a twelve-to-eighteen-month term promissory note security ("FPCMs") and a five-year private placement security ("Fund Offerings") based on the purported revenues Woodbridge received from making one-year loans to supposed third-party commercial property owners ("Borrowers"). Woodbridge and Shapiro induced prospective investors by falsely representing that the offerings were safe and secure and that they would use investors' funds to make loans to Borrowers as promised. They also concealed the scheme by creating fake promissory notes between those Borrowers and the Fund Offerings, purporting to show required repayment of these "loans."

Woodbridge's "Borrowers" were actually hundreds of companies wholly owned and controlled by Shapiro, which made no payments to Woodbridge as required under the purported promissory notes. Woodbridge and Shapiro's misrepresentations effectively hid the true nature of Woodbridge's business – a large-scale Ponzi scheme using new investor funds to pay existing investors' returns.

After amassing more than $1.22 billion of investor money, with more than $961 million in principal still due to investors, Woodbridge and Shapiro missed their first

interest payments to investors after purportedly ceasing their fundraising activities. Without the infusion of new investor funds, on December 4, 2017, Shapiro caused most of his companies to be placed in Chapter 11 Bankruptcy.

On February 11, 2019, Costa entered into an agreement with Woodbridge and its affiliated debtors and debtors in possession ("Debtors") in the jointly administered Chapter 11 case entitled *In re Woodbridge Group of Companies, LLC, et al.*, No. 17-12560-KJC. Costa and Costa Financial agreed with the Debtors to forego a distribution on the $164,000 in Woodbridge securities beneficially owned by Costa and Costa Financial and to resolve the claims the Woodbridge Trustee could have brought against Costa.

### Unregistered Sales Agents

Woodbridge used in-house sales staff and a nationwide network of mostly unregistered external sales agents to solicit at least 8,400 retail investors located throughout the United States. Woodbridge provided the sales agents with the information and marketing materials they gave to FPCM and Fund Investors. As noted above, Costa was one of the unregistered external sales agents. For his efforts, Costa and his company, Costa Financial, received $735,000 in transaction-based commissions earned as a result of raising more than $13 million from about 76 investors.

### Procedural History

On August 20, 2018, the Commission filed suit against Costa, Costa Financial, and three other Florida-based individual sales agents and their associated entities. On

October 31, 2018, the Court stayed the case while the Commission considered settlement offers from defendants other than Costa. On January 14, 2019, the Court entered judgments against those defendants. On May 8, 2019, this Court entered a Final Judgment on consent against Costa and Costa Financial, jointly and severally, ordering disgorgement in the amount of $664,147, together with prejudgment interest of $130,182.97, and requiring Costa to pay a civil penalty of $100,000.

Costa has made no payments towards the disgorgement order.

The Commission seeks to hold Costa in contempt to coerce him to comply with the Court's disgorgement order by paying the Judgment.

### Facts Relevant to SEC-Requested Show Cause Order & Contempt

Costa has made no payments towards the Final Judgment. Costa transferred his interest in real property located at 1604 Southeast 4th Street, Fort Lauderdale, Florida 33301 ("Subject Property") to his wife Wendy Costa's revocable trust on December 23, 2017 for no consideration. The Subject Property has no liens and is worth approximately $1.9 million, so Costa's interest could satisfy or substantially satisfy the Court's disgorgement order.

Several months before the Subject Property was transferred, Costa (on April 30, 2017) sent an email to Woodbridge, expressing concern about a letter from the Florida Office of Financial Regulation, asking for documents "going back to 2012." In that email, Costa said: "I'm **really worried** this may be another Texas or Mass can you advise what

to do **really worried**." (emphasis added). A little later the same day, Costa wrote another email to Woodbridge, asking "do you think we are **screwed**. Really **concerned.**" (emphasis added). [ECF No. 45-2].

In October 2017, Costa provided testimony to the SEC.

On December 4, 2017, Woodbridge filed for bankruptcy.

On December 21, 2017, the SEC filed its lawsuit against Shapiro and Woodbridge.

**Two days later**, on December 23, 2017, Costa and his wife executed a quitclaim deed, transferring the Fort Lauderdale property to his wife's revocable trust.

Costa transferred his interest in the property by quitclaim deed after the SEC sent him an investigative subpoena in August 2017 and after providing testimony to the SEC in October 2017. As noted, Costa effected the transfer two days after the SEC sued Shapiro and Woodbridge (and shortly after Woodbridge entered bankruptcy in December 2017).

The trust document for the Wendy Costa Revocable Living Trust says (on page 1) that it was created on July 8, 2016, by Wendy Costa. [ECF No. 49-1]. But it also says on the same page that the trust agreement was dated *June* 8, 2016. The trust document identifies Wendy Costa as the trustee. It lists Costa as the successor trustee. Article Two, Trust Property, provides that any property transferred to the trust shall "either be listed in Schedule 'A' annexed hereto or titled in the name of the Trust or the Trustee as nominee for the benefit of the Trust."

Schedule "A," Trust Property, lists only two properties. They are described, in only

handwriting, as "Condo" and "House." No further description of either of these two properties is provided.

As noted above, Costa entered a settlement agreement with the Debtors to resolve certain claims through the bankruptcy. As part of that settlement, Costa provided the Debtors with a Declaration under oath, asserting that he **had transferred no assets worth more than $10,000 within the two years before signing his declaration on January 11, 2019.**

Contrary to his representations in his sworn declaration, Costa transferred his interest in his $1.9 million home to his wife's revocable just more than a year earlier (on December 23, 2017).

The SEC filed its motion for an order to show cause why Costa should not be held in civil contempt [ECF No. 38]. Costa filed an opposition response, the SEC filed a reply, and United States District Judge Federico Moreno referred the motion to the Undersigned. [ECF Nos. 42; 45; 39]. The Undersigned has reviewed Costa's entire deposition transcript [ECF No. 42-1] and held a 1.5-hour Zoom hearing. [ECF No. 46]. In response to an order I entered, Costa filed the trust document. [ECF No. 49-1].

### The Hearing

At the hearing, the SEC attorney explained that, despite the motion's title, the request to hold Costa in contempt was one step removed and that the SEC was not *immediately* seeking a contempt order. Instead, before a contempt order should be

entered, the SEC conceded, the Court should (after factoring in the $1.9 million home) (1) first find that he has not satisfied his burden to show impossibility of payment; (2) then it should order Costa to pay; and then, (3) *if* he failed to make payment, find him in contempt and incarcerate him until the payment is made. In addition, the SEC clarified that it was not seeking a specific ruling ordering Costa to sell, pledge, or hypothecate any *particular* property or to take any definitive step. Rather, its counsel noted, it **would be up to Costa** to make the necessary financial arrangements to make the payment in full.

Further, the SEC advised that it would "work with" Costa on deadlines and other payment-related issues *if* he were making progress on payment. By way of illustration, if Costa were to make arrangements with his wife to sell the Fort Lauderdale home, but the buyer needed an additional 30 days to finalize financing and complete an inspection, then the SEC predicted that it would likely be flexible when considering requests for the payment deadline to be extended by 30 days.

### Additional Facts (from Costa's Deposition)

The Fort Lauderdale home is not the only real estate which Costa transferred by quitclaim deed. In 2009, he and his wife transferred a condominium, an investment property, to his wife by quitclaim deed. Costa decided to transfer the property because he was "having problems" with lawsuits and "just wanted to get this out of my name." [ECF No. 42-1, p. 37]. Likewise, he said, "I wanted to take [the condominium] out of my assets." *Id*. Costa explained that the problems which motivated the transfer were either

associated with the SEC or FINRA.[1] *Id.* He said that the SEC was investigating him in 2008 or 2009 but did not file a lawsuit against him. Costa noted that the SEC asked him for information but he "refused to give it to them." *Id.*

*The Parties' Contentions*

The SEC argues that Costa cannot establish that he made a good faith effort to use all reasonable steps to comply with the Final Judgment. More particularly, the SEC says that the defense of impossibility (i.e., "I have no assets to pay the judgment") is unavailable to Costa because the impossibility is self-created. The quitclaim deed transfer of Costa's home is, the SEC says, an illustration of an effort to purposefully strip himself of assets in order to avoid paying the judgment. According to the SEC, Costa could have used his pre-transfer interest in the home to satisfy the disgorgement order balance.

But Costa contends that the SEC's theory is fundamentally flawed because it incorrectly assumes that entireties property could have been used to fund the required payment. According to Costa, entireties property is exempt under state law and, as a result, a creditor holding a judgment against one spouse cannot force the other spouse to sell the property or to take steps to extract money from the property (such as obtaining a

---

[1]     FINRA is the Financial Industry Regulatory Authority. It is a private American corporation which acts as a self-regulatory organization which regulates member brokerage firms and exchange markets. The Undersigned takes judicial notice of FINRA's website, where it explains that it is "authorized by Congress to protect America's investors by making sure the broker-dealer industry operates fairly and honestly." The website further explains that FINRA "oversee[s] more than 624,000 brokers across the country – and analyze[s] billions of daily market events."

loan in exchange for a mortgage on entireties property). Costa also notes that the disgorgement order was not even in effect when the home was transferred in December 2017. And he says the transfer was done for a legitimate purpose: estate planning.

The SEC says it has a response to those arguments. First, it argues that Costa knew that a judgment/disgorgement order was imminent because of the SEC-filed lawsuit against Woodbridge, which occurred two days before the transfer. Second, it posits that the SEC is not like a garden-variety creditor. Thus, the SEC says, courts have equitable powers to reach assets otherwise protected by state law to satisfy SEC disgorgement obligations. In fact, the SEC argued (at the hearing) that it would have taken the same position even if Costa and his wife had not transferred the home to his wife's trust – because entireties property otherwise protected under state law can be reached to satisfy the federal court disgorgement obligation. Third, it challenges Costa's explanation that the quitclaim deed transfer was an innocuous estate-planning tool, pointing to his prior under-oath false statement in the bankruptcy proceeding and his testimony that an earlier and similar transfer of a condominium was done to dodge likely creditors.

## II.     Applicable Legal Principles and Analysis

Courts have inherent power to enforce compliance with their lawful orders through civil contempt. *Shillitani v. United States*, 384 U.S. 364, 370 (1966). Civil contempt is remedial; the penalty serves to enforce compliance with a court order or to compensate an injured party. *In re Stewart*, 571 F.2d 958, 963 (5th Cir. 1978) (cited by *In re Rumaker*, 646

F.2d 870, 871 (5th Cir. 1980). In a civil contempt proceeding, the petitioning party bears the burden of establishing by "clear and convincing" proof that the underlying order was violated. *Newman v. Graddick,* 740 F.2d 1513, 1525 (11th Cir. 1984); *Piambino v. Bestline Products, Inc.,* 645 F. Supp. 1210, 1213 (S.D. Fla. 1986).

However, once the moving party makes a prima facie showing that the court order was violated, the burden of production shifts to the alleged contemnor to show a "present inability to comply that goes 'beyond a mere assertion of inability....' " *Combs v. Ryan's Coal Co., Inc.,* 785 F.2d 970, 984 (11th Cir. 1986) (quoting *United States v. Hayes,* 722 F.2d 723, 725 (11th Cir. 1984)); *see also United States v. McAnlis,* 721 F.2d 334, 337 (11th Cir. 1983), *cert. denied,* 467 U.S. 1227 (1984).

In order to show that compliance with a court's order was impossible, the alleged contemnor must go beyond a mere assertion of inability and establish that he or she made "all reasonable efforts" to meet the terms of the court order. *Commodity Futures Trading Com'n v. Wellington Precious Metals, Inc.,* 950 F.2d 1525, 1529 (11th Cir. 1992) (affirming order denying motion to terminate contempt order and release contemnor from prison for failing to comply with disgorgement order). The "all reasonable efforts" requirement is strictly construed; it is insufficient to show that efforts were merely "substantial," "diligent," or in "good faith." *Id.* Moreover, a defendant's subjective beliefs or intent are irrelevant to the question of contempt. *F.T.C. v. Leshin,* 618 F.3d 1221, 1233 (11th Cir. 2010).

Given these standards, a showing that the defendant was unable to pay the *entire* restitution award is insufficient to avoid contempt; instead, the defendant must show an inability to pay *any portion* of the amount in question. *S.E.C. v. Greenberg,* 105 F. Supp. 3d 1342, 1353 (S.D. Fla. 2015) (Hurley, J.).

Therefore, the focus of the court's inquiry in civil contempt proceedings is not on the subjective beliefs or intent of the alleged contemnors in complying with the order, but whether in fact their conduct complied with the order at issue. *Jim Walter Res., Inc. v. Int'l Union, United Mine Workers of Am.,* 609 F.2d 165, 168 (5th Cir. 1980). Conduct that evinces substantial, but not complete, compliance with the court order may be excused if it was made as part of a good faith effort at compliance. *Newman,* 740 F.2d at 1524. *See also Howard Johnson Co., Inc. v. Khimani,* 892 F.2d 1512, 1516 (11th Cir. 1990).

Therefore, under the Eleventh Circuit's case law, the alleged contemnor may avoid a contempt finding by showing an inability to comply or a good faith effort to comply. *Howard Johnson Co., Inc.,* 892 F.2d at 1516, *see also United Student Aid Funds, Inc. v. Gary's Grading & Landscaping,* No. 6:07-cv-1140, 2009 WL 161711 (M.D. Fla. Jan. 21, 2009). While inability to pay is a defense to civil contempt, inability to pay is not a defense if the contemnor created the inability. *See e.g., Hodgson v. Hotard,* 436 F.2d 1110, 1116 (5th Cir. 1971); *Piambino,* 645 F. Supp. at 1215. *See generally S.E.C. v. Solow,* 682 F. Supp. 2d 1312 (S.D. Fla. 2010), aff'd 396 Fed. Appx. 635 (11th Cir. 2010) (summarizing case law authority

for rule that contempt defense of impossibility is unavailable if the contemnor created the inability and finding that broker could not successfully invoke the impossibility defense).

Disgorgement is an equitable remedy designed to deprive a wrongdoer of his unjust enrichment and to deter others from violating the securities laws. *S.E.C. v. Gane,* No. 03-cv-61553, 2005 WL 90154, at *19 (S.D. Fla. Jan. 4, 2005) (*citing S.E.C. v. First City Fin. Corp. Ltd.,* 890 F.2d 1215, 1230 (D.C. Cir. 1989)). A disgorgement order is more like an injunction for the public interest than a money judgment. *See S.E.C. v. Huffman,* 996 F.2d 800, 802–03 (5th Cir. 1993), *see also Steffen v. Gray, Harris & Robinson, P.A.,* 283 F. Supp. 2d 1272, 1282 (M.D. Fla. 2003), *aff'd sub nom. Steffen v. Gray, Harris & Robinson,* 138 Fed. Appx. 297 (11th Cir. 2005). Disgorgement is not precisely restitution; it wrests ill-gotten gains from the hands of a wrongdoer. *S.E.C. v. Huffman,* 996 F.2d at 802. It is this feature, the similarity to an injunction, that allows disgorgement orders, unlike judgments, to be enforced by civil contempt. *Id.* at 802–03.

This Court has broad equitable powers to reach assets otherwise protected by state law to satisfy a disgorgement. *See S.E.C. v. Manor Nursing Ctrs., Inc.,* 458 F.2d 1082, 1103 (2d Cir. 1972) ("Once the equity jurisdiction of the district court has been properly invoked by a showing of a securities law violation, the court possesses the necessary power to fashion an appropriate remedy").

For example, a district court can ignore state law exemptions as well as other state law limitations on the ability to collect a judgment in fashioning a disgorgement order.

*See Huffman,* 996 F.2d at 803 (holding that disgorgement is not a "debt" under the Federal Debt Collection Procedures Act, and defendants could not avail themselves of the state law exemption under the Act); *S.E.C. v. AMX, Int'l, Inc.,* 872 F. Supp. 1541, 1544–45 (N.D. Tex. 1994) (homestead exemption not taken into account); *S.E.C. v. Musella,* 818 F. Supp. 600 (S.D.N.Y. 1993) (holding exemptions from attachment under New York law did not alter a person's duty to pay under a disgorgement order); *see also Pension Benefit Guar. Corp. v. Ouimet Corp.,* 711 F.2d 1085, 1093 (1st Cir. 1983) (ignoring state law limitations on alter ego theory in ERISA context).

Moreover, in *S.E.C. v. Hickey,* 322 F.3d 1123 (9th Cir. 2003), the court held that the district court's broad equitable powers to reach third parties to effect orders in securities fraud enforcement actions allowed it to freeze a corporation's assets, even when there was no alter ego relationship under California law. The *Hickey* court stated the following:

> We do not think that state law limitations on the alter ego theory or doctrine are necessarily controlling in determining the permitted scope of remedial orders under federal regulatory statutes. Instead, federal courts have inherent equitable authority to issue a variety of ancillary relief measures in actions brought by the SEC to enforce the federal securities laws.

*S.E.C. v. Hickey,* 322 F.3d at 1131 (internal citations and quotations omitted). The court additionally stated:

> The necessity of the district court's asset freeze is demonstrated by the total and complete control that Hickey exercised over the Brokerage, and by the fact that Hickey's only source of income was the money that he ordered paid to himself through the Brokerage from the assets frozen by the court's order.

*Id.*

Costa's failure to satisfy his obligations under the Final Judgment warrants this Court holding him in civil contempt if he fails to make the required payment within 90 days.

A defendant is in civil contempt when: (1) it is shown by "clear and convincing evidence that the alleged contemnor has violated an outstanding court order;" and, (2) the defendant fails to show that "he has made 'in good faith all reasonable efforts' to meet the terms of the court order he is seeking to avoid." *Commodity Futures Trading Com'n.,* 950 F.2d at 1529. The facts and record before this Court support a finding of civil contempt against Costa if he does not make the required payment to satisfy the disgorgement order within 90 days from the date of a Judge Moreno-entered order approving and adopting this Report and Recommendations.

### The Final Judgment Ordered Costa to Pay Disgorgement

The May 8, 2019 Final Judgments [ECF Nos. 35; 36] ordered Costa and Costa Financial Services Corp., jointly and severally, to disgorge $664,147, together with prejudgment interest of $130,182.97. They were ordered to "satisfy this obligation" by paying the ordered amount "to the Securities and Exchange Commission within 14 days from the entry of this Final Judgment." [ECF Nos. 35; 36] In the two years since the entry of the Judgment, Costa and his company have failed to pay anything towards the disgorgement order.

Accordingly, Costa[2] has violated the terms of the Final Judgment and now has the burden of coming forward with evidence showing "categorically and in detail" why he is unable to comply with the Court's order. *Fed. Trade Comm'n v. Affordable Media*, LLC, 179 F.3d 1228, 1241 (9th Cir. 1999).  In asserting that he is unable to comply, he must show that "he has made 'in good faith all reasonable efforts'" to do so. *Commodity Futures Trading Com'n*, 950 F.2d at 1529 (quoting *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir.1988).

To the extent Costa cannot satisfy this burden because his inability to pay disgorgement is self-created, then the impossibility defense is unavailable to him. *In re Lawrence*, 279 F.3d 1294, 1300 (11th Cir. 2002).

The instant case is similar to the reported cases of *In re Lawrence,* 279 F.3d 1294 (11th Cir. 2002) and *S.E.C. v. Bilzerian*, 112 F. Supp. 2d 12 (D.D.C. 2000). In *Bilzerian*, the Defendant "maintain[ed] that he [had] no meaningful assets with which to pay the judgment, claiming that all of his assets were lost, disgorged, or transferred long ago." *Bilzerian*, 112 F. Supp. 2d at 17–18. Bilzerian's assets were **transferred to his wife**, a web of corporations, and, inter alia, a Cook Islands trust. *Id.* at 25; *see also, Steffen*, 283 F. Supp. 2d at 1276–77.

"The SEC's primary argument [was] that Bilzerian [had] attempted to hide his

---

[2]     The Court entered a judgment against Costa and a separate judgment against Costa Financial Services Corp., and neither Defendant has paid anything. The SEC's motion, however, seeks relief only against Costa himself.

ability to comply with the Court's orders by transferring assets he held directly into off-shore trusts and other entities in which he maintain[ed] an indirect beneficial interest." *Bilzerian,* 112 F. Supp. 2d at 24. The district court found Bilzerian's financial disclosure to be misleading due to its failure to include Bilzerian's "indirect beneficial interests." *Id.* The court held that it "may consider all potential sources of funds available to Bilzerian, **including jointly-owned assets**." *Id.* at 25 ("a one-half interest in Bilzerian's and his wife's jointly-held assets could be a very substantial financial resource.").

In the instant case, Costa says he has no assets and explains that the $1.9 million home which he used to own jointly with his wife is no longer available because his wife's trust is the record title owner. But this explanation does not meet the *Bilzerian* approach, where the court held that the defendant "failed to demonstrate that he [had] made in good faith all reasonable efforts to comply with the Court's disgorgement orders." *Bilzerian,* 112 F. Supp. 2d at 26 (noting that a "party seeking to avoid a finding of contempt must demonstrate that 'all reasonable avenues for raising funds have been explored and exhausted.'").

The Court noted that Bilzerian's efforts were devoted not to showing the court that he was diligent in complying, but rather "his diligent efforts [had] been focused on how to avoid compliance with the Court's orders." *Id.; see also, S.E.C. v. Yun,* 208 F. Supp. 1279, 1286 (M.D. Fla. 2002) 2d at 1286 ("[a]lthough Yun has made no attempt to pay the

judgment . . . she has gone to great lengths to avoid doing so, taking deliberate steps to deplete her assets since the entry of this Court's final judgment.").

Finally, the *Bilzerian* court held that even if the defendant could not reclaim control over the assets he transferred away, Bilzerian would still be held in contempt because an inability defense is unavailable where the inability was created by the defendant himself. *Bilzerian*, 112 F. Supp. 2d at 28 (noting further that if the defendant cannot convince the transferees "to return his assets to him, it is **a problem of his own making**.") (citing *Piambino v. Bestline Products, Inc.*, 645 F. Supp. 1210, 1215 (S.D. Fla. 1986)) (emphasis added).

Using this analysis, Costa would need to convince his wife to return the unencumbered residential property to a joint tenancy, where Costa's interest could be used to pay the judgment. Costa has not advised the Court of any efforts to persuade his wife to transfer back the home.

To return to the *Bilzerian* analogy, Bilzerian's wife, Steffen, later filed for bankruptcy. After that, with her husband in jail for contempt and her assets frozen, she settled with the SEC to obtain Bilzerian's release from prison and the release of her frozen assets.

Lawrence, Bilzerian and Solow each divested control over their assets and then represented to their trial judges that it was impossible for them to make their court-ordered payments. *In re Lawrence*, 279 F.3d at 1296–97; *Bilzerian*, 112 F. Supp. 2d at 17–23;

*Solow*, 682 F. Supp. 2d 1312. Like the defendant in *Lawrence,* Costa divested himself of his interest in the home in anticipation of the judgment.

Costa highlights the fact that the judgment did not exist at the time of the transfer, but that does not immunize his transfer. The Undersigned concludes that it is no coincidence that Costa and his wife transferred the home by quitclaim deed two days after the SEC filed a lawsuit against Woodbridge, where Costa worked.

Moreover, the Undersigned is far from convinced that Costa and his wife transferred the home solely for estate planning purposes. He has not explained how or why the transfer would further a legitimate estate planning arrangement. And he has not adequately explained the *timing* of the transfer. In effect, Costa is asking the Court to accept the theory that the estate-planning transfer coincidentally happened two days after the SEC's lawsuit was filed. The Undersigned rejects that implicit approach.

Therefore, the Undersigned finds that Costa has not made good faith reasonable efforts to retrieve his valuable residential real estate asset. *See also Securities and Exchange Comm'n v. Commodities Online, LLC,* No. 11-60702 , 2021 WL 13134210 (S.D. Fla. May 14, 2012), (citing *Solow* and recommending a finding of civil contempt and incarceration); *United States v. D'Argenio*, No. 01-00010, 2019 WL 297091 (S.D. Fla., Jan. 3, 2019), *report and recommendation adopted*, 01-00010-CR, 2019 WL 296534 (S.D. Fla. Jan. 23, 2019) (citing *Solow* and concluding that defendant should be held in civil contempt for not complying with an order requiring the payment of restitution); *S.E.C. v. Aragon Capital Advisors, LLC*, No.

07 CIV.919 FM, 2011 WL 3278907 (S.D.N.Y. July 26, 2011) (citing *Solow* and granting motion to hold defendant in contempt and noting that, to purge contempt, defendant had to, among other requirements, make payments from available assets in 14 days and to immediately repatriate assets located outside the United States).

Following the *Lawrence* precedent, the Undersigned recommends that Judge Moreno hold Costa in contempt of the Court's Final Judgment if he does not, within 90 days of an order approving the Report and Recommendations, make good faith reasonable efforts to retrieve the $1.9 million home and apply his portion of the asset toward the Final Judgment.

At bottom, the Undersigned has no hesitancy in announcing my skepticism of Costa's financial maneuver in transferring jointly held property to his wife's trust by a quitclaim deed two days after the SEC's lawsuit was filed. That skepticism is bolstered by his false answer in the bankruptcy proceeding and the deposition testimony he gave to the SEC in this case, where he effectively admitted that an earlier transfer was accomplished to remove assets from his name and render them immune from collection.

Given Costa's argument about the entireties status of the home, the Undersigned addresses *S.E.C. v. Yun,* 208 F. Supp. 2d 1279, 1284 (M.D. Fla. 2002), where Defendant Yun was found liable for fraudulent insider trading. The court issued a final judgment requiring, *inter alia,* disgorgement of $269,000. Yun sought a stay pending appeal but challenged having to post a supersedeas bond. The *Yun* court disregarded state law asset

protections, but, given the circumstances of the case, chose to honor the protection of a family home owned by the husband of the defendant as a tenancy by the entirety.

Significantly, the *Yun* court stated:

> Yun owns three separate annuity contracts ... [and][a]lthough these annuities are immune from process under Florida law ... this is not a Florida state court, and, as such, it **is not bound by Florida law.** Although a district court may choose to be guided by state statutes exempting certain property from judgment collection efforts, the district court has broad discretion in fashioning the equitable remedy of a disgorgement order ... ***This Court, in its discretion, will not be guided by state law where its effect is to make a liable party judgment proof.*** Therefore, this Court finds that Yun must rely on her annuity contracts should that be necessary to post a full supersedeas bond.

*Yun,* 208 F. Supp. 2d at 1283–84 (internal citations and quotations omitted, emphasis added).

This Court does not have to recognize the protections of tenancy by the entirety created by state law. The *Yun* court articulated sound reasoning for declining to force the defendant to disgorge her home in that particular case. In *this* case, however, such reasoning is not as persuasive, given Costa's false answer in the bankruptcy proceeding and his prior scheme to strip himself of assets by transferring real estate out of his name.

Unlike Yun, by his own account, Costa does not have any other assets that he can use to satisfy the disgorgement judgment. Moreover, given Costa's history (as explained above), the Undersigned deems it a prudent exercise of discretion to ignore the state law protection for a tenancy by the entirety.

It may well be that another judge, maybe even the judge in *Yun*, could reach a

different conclusion about the lien-free $1.9 million property. But *"the application of an abuse-of-discretion review recognizes the range of possible conclusions the trial judge may reach."* *Norelus v. Denny's, Inc.,* 628 F.3d 1270, 1280 (11th Cir. 2010); *In re Rasbury*, 24 F.3d 159 (11th Cir. 1994) ("[T]he abuse of discretion standard allows 'a range of choice for the district court, so long as that choice does not constitute a clear error of judgment.'"); *Kern v. TXO Prod. Corp.,* 738 F.2d 968, 970-71 (8th Cir. 1984) ("The very concept of discretion presupposes a zone of choice within which the trial courts may go either way"). See also *McMahan v. Toto*, 256 F.3d 1120, 1129 (11th Cir. 2001), amended on reh'g, 311 F.3d 1077 (11th Cir. 2002) (noting that "under an abuse of discretion standard there will be circumstances in which we would **affirm the district court whichever way it went**") (emphasis supplied).

As the Eleventh Circuit noted in *Norelus,*

> [U]nder an abuse of discretion standard there will be circumstances in which we would affirm the district court whichever way it went[.] [*See*] *In re Rasbury,* 24 F.3d 159, 168 (11th Cir.1994) ("Quite frankly, we would have affirmed the district court had it reached a different result, and if we were reviewing this matter *de novo,* we may well have decided it differently."). [W]hen employing an abuse-of-discretion standard, we must affirm unless we find that the district court has made a clear error of judgment, or has applied the wrong legal standard.

*Id.* (first and last alterations in original) (internal quotation marks omitted).

Thus, the Undersigned recognizes that another magistrate judge might reach a different conclusion when exercising discretion and determining whether to reject state

exemptions to protect the real estate which Costa used to own with his wife in a tenancy by the entirety.

This Court, in its equitable powers, could have reached Costa's assets that were held jointly, or by tenancy by the entirety, before their transfer to his wife's trust. Therefore, Costa's argument that such assets were *never* available to satisfy the disgorgement is unavailing. As such, the situation is straightforward: Costa transferred the real estate to his wife after the SEC's lawsuit was filed and before the disgorgement order to avoid the forthcoming disgorgement order.

In response to Costa's argument that his case is distinguishable from other impossibility cases because he transferred his assets before the judgment was entered against him, the *Lawrence* court held that "[t]his contention clearly lacks merit ... Lawrence created this Trust in an obvious attempt to shelter his funds from an expected adverse arbitration award." *In re Lawrence*, 279 F.3d at 1300. As the *Lawrence* court stated:

> Even if we were to find that [the debtor] had set forth sufficient evidence of impossibility, we must agree with the trial court that [the debtor's] claimed defense is invalid because the asserted impossibility was self-created. We previously have held that, 'where the person charged with contempt is responsible for the inability to comply, the impossibility is not a defense to the contempt proceedings.'

*Id.*

In this case, even if Costa is presently unable to comply with this Court's order of disgorgement, such a situation is one that he created. The Florida Supreme Court has held that one spouse may not alienate a portion of the tenancy by the entireties without

24

the consent of the other. *Beal Bank, SSB v. Almand & Assocs.*, 780 So. 2d 45, 56 (Fla. 2001). Therefore, in order to effect the transfers of the valuable home assets from Costa and his wife, held as tenancy by the entirety, Costa would have needed to consent. Such self-created penury does not exempt Costa from being held in contempt by this Court if he does not use the asset to pay the judgment within 90 days from a Judge Moreno Order ratifying this Report and Recommendations. *See In re Lawrence; see also In re Power Recovery Sys., Inc.*, 950 F.2d 798, 803 (1st Cir. 1991) (finding that a party may defend contempt and failure to comply on the grounds that compliance was impossible; self-induced inability, however, does not meet the test). *See generally S.E.C. v. AMX, Intern., Inc.*, 7 F.3d 71, 76 (holding that court has discretion to subject or refuse to subject home to a disgorgement order).

This Court finds that Costa was diligent in his efforts to divest himself of a valuable asset that would otherwise have been available to satisfy the Court's disgorgement order. He was not nearly as diligent in pursing strategies to *recover* an asset which could be used to pay the disgorgement order. His professed inability to pay the amounts ordered by the Court is disingenuous at best. As in the *Yun, Bilzerian, Lawrence* and *Solow* cases, the Court holds that Costa's inability defense is unavailing because such inability was self-created.

If Costa cannot convince his spouse to return what appears to have been his largest asset to him (and to her, as a joint owner), then that is a problem of his own making and the Undersigned recommends that he be held in contempt of court if he does not take

steps to use what was his half share in the $1.9 million home to pay the disgorgement order in 90 days.

Although Costa contends that he has nothing with which to pay the Final Judgment, it bears repeating that this "mere assertion of '*present* inability' is insufficient to avoid a civil contempt finding." *In re Lawrence,* 251 B.R. 630, 652 (S.D. Fla. 2000), *aff'd,* 279 F. 3d 1294 (11th Cir. 2002) (emphasis added). *See also, S.E.C. v. Musella,* 818 F. Supp. 600, 602 (S.D.N.Y. 1993) ("a mere showing that the party was unable to pay the entire amount ... is insufficient to avoid a finding of contempt.... [T]he party must pay what he or she can.") (*citing, Piambino v. Bestline Prods., Inc.,* 645 F. Supp. 1210, 1214 (S.D. Fla. 1986)).

The Court finds that Costa's arguments do not establish an inability to pay defense. As United States District Judge Donald M. Middlebrooks succinctly noted in *S.E.C. v. Solow,* Costa's "duty to the Court is to make good faith efforts to pay as much of the judgment as possible, not to obfuscate his burden in these proceedings by arguing the non-issue of tenancy by the entireties." 682 F. Supp. 2d at 1330. *See also, Bilzerian,* 112 F. Supp. 2d at 26 ("the Court is not limited to considering only [defendant's] individually owned assets in determining his ability to comply")."

Costa lives in a lien-free $1.9 million home and "enjoys the representation of sophisticated defense counsel in these proceedings." *Solow,* 682 F. Supp. 2d at 1331. Moreover, as noted in *Solow,* Defendant "still lives a luxurious lifestyle, enjoying the

benefits of the money he has made over the years, yet he refuses to repay the victims of his fraud. Such a situation cannot stand." *Id.* at 1334.

The record is unclear about how luxurious a lifestyle Costa now enjoys. At the hearing, his lawyer explained that Mrs. Costa is a highly successful interior designer with her own business. Regardless of whether Mrs. Costa's income is supplementing her husband's Social Security benefits, the inescapable reality is that he lives in a $1.9 million home, unencumbered by debt or mortgage, and can afford top-notch counsel to challenge the SEC's motion and represent him at a deposition.

In addition, as emphasized above, "[a] party seeking to avoid a finding of contempt must demonstrate that '*all* reasonable avenues for raising funds have been explored and exhausted.'" *Bilzerian*, 112 F. Supp. 2d at 26 (emphasis added) (*citing Phoenix Marine Ents., Inc. v. One (1) Hylas 46' Convertible Sportfisherman Hull No. 1*, 681 F. Supp. 1523, 1529 (S.D. Fla. 1988)).

Costa failed to make such efforts. "Rather, his diligent efforts have been focused on how to avoid compliance with the Court's orders." *Bilzerian*, 112 F. Supp. 2d at 27. If Costa cannot convince his wife to return his assets to him, then "it is a problem of his own making." *Id.* at 28 (citing *Piambino v. Bestline Prods., Inc.*, 645 F. Supp. 1210, 1215 (S.D. Fla. 1986)).

Similar to the arguments Solow unsuccessfully raised, Costa asks the Court to accept the principle that any assets he once held as a tenancy by the entirety with his wife

(now transferred by quitclaim deed solely to his wife's trust) were never reachable by the disgorgement order, even before the asset was transferred. But, as the *Solow* court held, "[t]his argument fails because, according to the Eleventh Circuit, to avoid civil contempt, the alleged contemnor must make all reasonable efforts to satisfy the judgment. Such a requirement commands a different conclusion from that drawn by Mr. [Costa]." *Solow*, 682 F. Supp. at 1333.

## III.    Conclusion

Costa's legal arguments might be more persuasive if they were asserted in a state court case involving a garden-variety money judgment held by a non-governmental creditor, as opposed to a disgorgement order entered in a federal case in the SEC's favor for the benefit of fraud victims. As explained in *S.E.C. v. Nat. Diamonds Inv. Co.*, No. 19-CV-80633, 2019 WL 2583863, at *9 (S.D. Fla. June 11, 2019):

> Federal district courts have broad equitable powers to reach assets otherwise protected by state law to satisfy a disgorgement award. *S.E.C. v. Solow*, 682 F. Supp. 2d 1312, 1325 (S.D. Fla. 2010) (citing cases). *See also Branch Banking & Tr. Co. v. Hamilton Greens, LLC*, No. 11–80507–CIV, 2014 WL 1603759 (S.D. Fla. Feb. 26, 2014) (Report and Recommendation) ("Because federal courts have 'broad equitable powers to reach assets otherwise protected by state law to satisfy a disgorgement' it would appear as though **federal courts have more power to enforce compliance with a disgorgement order than they do with a standard money judgment.**") (quoting *Solow*, 682 F. Supp. 2d at 1325) (affirmed and adopted at *Branch Banking and Tr. Co. v. Hamilton Greens, LLC*, 2014 WL 1493086 (S.D. Fla. Mar. 24, 2014)) (emphasis added).

Costa has had ample time to make efforts to (1) simply pay the disgorgement; (2) avoid taking steps that tie up his assets; or (3) take steps to unwind his assets and make

a payment to the Registry of the Court. In all this time, Costa has done none of those things, despite the SEC's filing of a motion for a show cause order as to why he should not be held in contempt of court.

Costa has had time to pay the disgorgement while the victims of his fraud continue to wait for repayment. I do not see irreparable injury to Mr. Costa by recommending that he be held in in contempt if he does not take all reasonable steps to pay the disgorgement order within three months. His alleged injury does not outweigh the injury to the SEC and the fraud victims should Costa not pay the disgorgement, because the disgorgement payments go to the victims of the fraud.

Costa continues to enjoy the fruits of his wrongdoing while his victims face hardship. A disgorgement order is more like an injunction for the public interest than a money judgment. *See SEC v. Huffman*, 996 F.2d 800, 802–03 (5th Cir.1993). The public's interest lies in enforcement of this Court's order of disgorgement.

Therefore, the Undersigned **respectfully recommends** that Judge Moreno find Costa in contempt if he does not exhaust all avenues to pay the disgorgement order within three months of an order adopting and ratifying this Report. It is up to Costa to decide how to pay the disgorgement order, but arranging for his wife to have her trust transfer the $1.9 million home to both of them is certainly a viable option which he will need to seriously explore. And, as explained above, if his wife refuses the request, then his predicament is due to his own actions.

## IV.     Objections

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendations within which to file written objections, if any, with the District Judge. Each party may file a response to the other party's objection within fourteen (14) days of the objection. Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary, in the interest of justice. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).

**RESPECTFULLY RECOMMENDED** in Chambers, in Miami, Florida, on June 3, 2021.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to**:
The Honorable Federico A. Moreno
All Counsel of Record