## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### CASE NO. 18-cv-23369-MORENO/GOODMAN

SECURITIES AND
EXCHANGE COMMISSION,

      Plaintiff,

v.

BARRY KORNFELD, et al.,

      Defendants.

_____/

### _AMENDED_ REPORT AND RECOMMENDATIONS ON SEC'S MOTION FOR A SHOW CAUSE ORDER ON WHY DEFENDANT ANDREW COSTA SHOULD NOT BE HELD IN CONTEMPT

The Undersigned entered a Report and Recommendations ("R & R") on the SEC's

motion for a show cause order on why Defendant Andrew Costa should not be held in

contempt. [ECF No. 50]. The R & R recommended that the motion be granted, and that

Costa pay the judgment in 90 days or be held in civil contempt if he did not make the

payment or demonstrate that payment arrangements were under way. Although the R &

R did not specify the precise steps which Costa would need to take to pay the judgment,

the R & R (and the SEC's motion) focused on his residential home, which he and his wife

had transferred to his wife's trust by quitclaim deed two days after the SEC filed a lawsuit

against an entity accused of operating a fraudulent Ponzi scheme. Costa was an

unregistered sales agent for the Ponzi-involved entity.

Costa filed a motion for an enlargement of time to file Objections to the R & R. [ECF No. 51]. His motion explained that the ownership of his residential home, which is the subject of the R & R, had been transferred *back* to him and his wife as joint tenants by the entireties. He proffered his belief that this development "directly impacts and may well materially change the Magistrate's [Judge's] recommendation to the Court regarding the subject matter of the R & R." *Id.* at p. 2.

United States District Judge Federico A. Moreno granted the motion, and Costa filed his Objections. [ECF Nos. 53; 54]. Judge Moreno then referred [ECF No. 55] the matter to me to advise whether the second transfer of the subject property (back to Costa and his wife as tenants by the entireties) changes my R & R.

The Undersigned then entered an Order [ECF No. 56] permitting the SEC to take the depositions of Costa and his wife and requiring the SEC and Costa to each submit a memorandum discussing whether the recent "real estate transfer impacts the R & R, and, if so, how and why." *Id.* Both the SEC and Costa filed the required legal brief [ECF Nos. 58; 59], and the Undersigned held a one-hour Zoom hearing [ECF No. 61].

For the reasons outlined in greater detail below, the Undersigned concludes that the recent transfer **does** impact the legal analysis and assessment of the SEC's show cause motion. Therefore, I am issuing this *amended* Report and Recommendations.

By way of introductory summary, though, the Court may have the *discretion* to use

its authority to enter an Order disregarding the property rights inherent in a residential tenancy by the entireties in order to enforce a disgorgement order. Nevertheless, the Undersigned concludes that the discretion (assuming that it exists in the first place) should not be exercised that way *here* given the specific facts.

The referral-based need to evaluate this collection again has also caused the Undersigned to question whether Eleventh Circuit law specifically and unequivocally permits the SEC to successfully seek a contempt order merely because a judgment debtor facing a disgorgement order cannot persuade his wife to give up her share of a house owned by them as entireties property. More on this later.

Moreover, at the recent hearing, although the SEC advised that it would likely file objections if I were to recommend that the contempt order not be entered in connection with the Costas' longtime residential home, it also **conceded** that the Court **would not commit reversible error** if it decided to not hold Costa in contempt if he did not somehow arrange for his wife to give up her share of the entireties property.

For the reasons outlined below, the Undersigned **respectfully recommends** that the Court **deny** the SEC's motion for a show cause order.

I.      **Factual & Procedural Background**

Costa was an unregistered sales agent for Woodbridge Group of Companies, LLC, which operated a Ponzi scheme selling more than $1.22 billion in unregistered transactions. Costa sold unregistered securities to retail investors in at least six states. The

Court entered Final Judgement against him in May 2019, ordering him to pay $794,330 in disgorgement and prejudgment interest and a $100,000 penalty. Costa has paid none of that.

Costa lives with his wife in a lien-free, 3,000-foot Fort Lauderdale home worth approximately $1.9 million and which he and his wife transferred to a trust by quitclaim deed two days after the SEC sued Woodbridge. This is the transfer which the Costas effectively undid when they recently arranged, after the initial R & R, to deed the residential real estate property back to both of them as tenants by the entireties.

Costa says he has no assets other than a 2015 Ford Explorer to pay the judgment. He says that Social Security is his sole source of income, and that the home should not be used to pay the disgorgement because it would unfairly deprive his wife of her property rights in entireties property.

The SEC initially argued that Costa's professed inability to pay the disgorgement is a self-created scenario, and it asked the Court to require him to pay the judgment and, if Costa fails to comply, to impose civil contempt, including incarceration.

Costa opposed the SEC's motion, arguing that the real estate had been held jointly by him and his wife for 40 years in a tenancy by the entirety, which made it exempt from collection under state law. Therefore, he said, the quitclaim deed transfer to his wife's trust was not designed to shelter his assets from the SEC (because it was *already* exempt or protected as entireties property). And he explained that an incorrect, under-oath

answer in a bankruptcy proceeding (in which he denied transferring the property) was one given without the benefit of counsel and the result of confusion.

The SEC argued that Costa's credibility about his false declaration in the bankruptcy proceeding is problematic, and it contended that the Court has the power to reject state law exemptions when enforcing a federal court disgorgement order. It wants the Court to use its contempt power to pressure Costa into making payment, for the ultimate benefit of the fraud victims.

As succinctly noted above, the Undersigned initially recommended that the Court grant the SEC's motion for a show cause order [ECF No. 38], requiring Costa to pay the judgment within 90 days, and to hold him in civil contempt if he does not make the payment or demonstrate that payment arrangements are under way (such as a signed contract for the sale of the house with a closing date in 100 days or a commitment letter from a bank which authorized a loan -- using the house as collateral -- after an appraisal scheduled a few days after expiration of the 90-day period).

This initial recommendation did not specify the *precise* steps which Costa must take to pay the judgment. It mentioned some possibilities, such as arranging for his wife to sell the home and use some of the sale proceeds to pay the judgment. Alternatively, it noted that Costa could try to convince his wife to use the home as collateral for a loan and use some of the loan proceeds to pay the judgment.

This Amended R & R will first discuss the facts before the initial recommendation

and then outline the more-recent, post-R & R, developments.

### a. *General, Pre-R & R Background*

From July 2012 to December 2017, Woodbridge and its CEO/Owner, Robert Shapiro, operated a massive Ponzi scheme selling more than $1.22 billion in securities in unregistered transactions through in-house sales staff and a network of external unregistered sales agents. From at least June 2014 to December 2017, Costa was one of these unregistered sales agents for Woodbridge and personally solicited and sold unregistered Woodbridge securities to retail investors in at least six states. The Court entered Final Judgment against Costa in May 2019, ordering him to pay $794,329.97 in disgorgement and prejudgment interest and a penalty of $100,000. Costa has not made any payments towards these obligations.

### b. *Woodbridge Ponzi Scheme*

Woodbridge sold investors two primary products, a twelve-to-eighteen-month term promissory note security ("FPCMs") and a five-year private placement security ("Fund Offerings") based on the purported revenues Woodbridge received from making one-year loans to supposed third-party commercial property owners ("Borrowers"). Woodbridge and Shapiro induced prospective investors by falsely representing that the offerings were safe and secure and that they would use investors' funds to make loans to Borrowers as promised. They also concealed the scheme by creating fake promissory notes between those Borrowers and the Fund Offerings, purporting to show required

repayment of these "loans."

Woodbridge's "Borrowers" were actually hundreds of companies wholly owned and controlled by Shapiro, which made no payments to Woodbridge as required under the purported promissory notes. Woodbridge and Shapiro's misrepresentations effectively hid the true nature of Woodbridge's business -- a large-scale Ponzi scheme using new investor funds to pay existing investors' returns.

After amassing more than $1.22 billion of investor money, with more than $961 million in principal still due to investors, Woodbridge and Shapiro missed their first interest payments to investors after purportedly ceasing their fundraising activities. Without the infusion of new investor funds, on December 4, 2017, Shapiro caused most of his companies to be placed in Chapter 11 Bankruptcy.

On February 11, 2019, Costa entered into an agreement with Woodbridge and its affiliated debtors and debtors in possession ("Debtors") in the jointly administered Chapter 11 case entitled *In re Woodbridge Group of Companies, LLC, et al.*, No. 17-12560-KJC. Costa and Costa Financial agreed with the Debtors to forego a distribution on the $164,000 in Woodbridge securities beneficially owned by Costa and Costa Financial and to resolve the claims the Woodbridge Trustee could have brought against Costa.

### c. *Unregistered Sales Agents*

Woodbridge used in-house sales staff and a nationwide network of mostly unregistered external sales agents to solicit at least 8,400 retail investors located

throughout the United States. Woodbridge provided the sales agents with the information and marketing materials they gave to FPCM and Fund Investors. As noted above, Costa was one of the unregistered external sales agents. For his efforts, Costa and his company, Costa Financial, received $735,000 in transaction-based commissions earned as a result of raising more than $13 million from about 76 investors.

### d. Pre-R&R Procedural History

On August 20, 2018, the Commission filed suit against Costa, Costa Financial, and three other Florida-based individual sales agents and their associated entities. On October 31, 2018, the Court stayed the case while the Commission considered settlement offers from defendants other than Costa. On January 14, 2019, the Court entered judgments against those defendants. On May 8, 2019, this Court entered a Final Judgment on consent against Costa and Costa Financial, jointly and severally, ordering disgorgement in the amount of $664,147, together with prejudgment interest of $130,182.97, and requiring Costa to pay a civil penalty of $100,000.

Costa made no payments towards the disgorgement order.

The Commission seeks to hold Costa in contempt to coerce him to comply with the Court's disgorgement order by paying the Judgment.

### e. Pre-R&R Facts Relevant to SEC-Requested Show Cause Order & Contempt

Costa has made no payments towards the Final Judgment. Costa transferred his interest in real property located at 1604 Southeast 4th Street, Fort Lauderdale, Florida

33301 ("Subject Property") to his wife Wendy Costa's revocable trust on December 23, 2017 for no consideration. The Subject Property has no liens and is worth approximately $1.9 million, so Costa's interest could satisfy or substantially satisfy the Court's disgorgement order.

Several months before the Subject Property was transferred, Costa (on April 30, 2017) sent an email to Woodbridge, expressing concern about a letter from the Florida Office of Financial Regulation, asking for documents "going back to 2012." In that email, Costa said: "I'm really worried this may be another Texas or Mass can you advise what to do really worried." A little later the same day, Costa wrote another email to Woodbridge, asking "do you think we are screwed. Really concerned." [ECF No. 45-2].

In October 2017, Costa provided testimony to the SEC.

On December 4, 2017, Woodbridge filed for bankruptcy.

On December 21, 2017, the SEC filed its lawsuit against Shapiro and Woodbridge.

Two days later, on December 23, 2017, Costa and his wife executed a quitclaim deed, transferring the Fort Lauderdale property to his wife's revocable trust.

Costa transferred his interest in the property by quitclaim deed after the SEC sent him an investigative subpoena in August 2017 and after providing testimony to the SEC in October 2017. As noted, Costa effected the transfer two days after the SEC sued Shapiro and Woodbridge (and shortly after Woodbridge entered bankruptcy in December 2017).

The trust document for the Wendy Costa Revocable Living Trust says (on page 1)

that it was created on July 8, 2016, by Wendy Costa. [ECF No. 49-1]. But it also says on the same page that the trust agreement was dated June 8, 2016. The trust document identifies Wendy Costa as the trustee. It lists Costa as the successor trustee. Article Two, Trust Property, provides that any property transferred to the trust shall "either be listed in Schedule 'A' annexed hereto or titled in the name of the Trust or the Trustee as nominee for the benefit of the Trust." *Id.* at p. 2.

Schedule "A," Trust Property, lists only two properties. They are described, in only handwriting, as "Condo" and "House." *Id.* at p. 12. No further description of either of these two properties is provided.

As noted above, Costa entered a settlement agreement with the Debtors to resolve certain claims through the bankruptcy. As part of that settlement, Costa provided the Debtors with a Declaration under oath, asserting that he had transferred no assets worth more than $10,000 within the two years before signing his declaration on January 11, 2019.

Contrary to those comments in his declaration, Costa transferred his interest in his $1.9 million home to his wife's revocable just more than a year earlier (on December 23, 2017).

The SEC filed its motion for an order to show cause why Costa should not be held in civil contempt [ECF No. 38]. Costa filed an opposition response, the SEC filed a reply, and United States District Judge Federico Moreno referred the motion to the Undersigned. [ECF Nos. 42; 45; 39]. The Undersigned reviewed Costa's entire deposition

transcript [ECF No. 42-1] and held a 1.5-hour Zoom hearing. [ECF No. 46]. In response to an order I entered, Costa filed the trust document. [ECF No. 49-1].

### f. The Initial, Pre-R & R Hearing

At the hearing, the SEC attorney explained that, despite the motion's title, the request to hold Costa in contempt was one step removed and that the SEC was not *immediately* seeking a contempt order. Instead, before a contempt order should be entered, the SEC conceded, the Court should (after factoring in the $1.9 million home) (1) first find that he has not satisfied his burden to show impossibility of payment; (2) then it should order Costa to pay; and then, (3) *if* he failed to make payment, find him in contempt and incarcerate him until the payment is made. In addition, the SEC clarified that it was not seeking a specific ruling ordering Costa to sell, pledge, or hypothecate any particular property or to take any definitive step. Rather, its counsel noted, it would be up to Costa to make the necessary financial arrangements to make the payment in full.

Further, the SEC advised that it would "work with" Costa on deadlines and other payment-related issues if he were making progress on payment. By way of illustration, if Costa were to make arrangements with his wife to sell the Fort Lauderdale home, but the buyer needed an additional 30 days to finalize financing and complete an inspection, then the SEC predicted that it would likely be flexible when considering requests for the payment deadline to be extended by 30 days.

### g.  Additional Facts (from Costa's Initial, Pre-R & R Deposition)

The Fort Lauderdale home is not the only real estate which Costa transferred by quitclaim deed. In 2009, he and his wife transferred a condominium, an investment property, to his wife by quitclaim deed. Costa decided to transfer the property because he was "having problems" with lawsuits and "just wanted to get this out of my name." [ECF No. 42-1, p. 37]. Likewise, he said, "I wanted to take [the condominium] out of my assets." *Id*. Costa explained that the problems which motivated the transfer were either associated with the SEC or FINRA.[1] *Id*. He said that the SEC was investigating him in 2008 or 2009 but did not file a lawsuit against him. Costa noted that the SEC asked him for information but he "refused to give it to them." *Id.*

### h.  The Parties' Initial, Pre-R & R Contentions

The SEC argued that Costa cannot establish that he made a good faith effort to use all reasonable steps to comply with the Final Judgment. More particularly, the SEC says that the defense of impossibility (i.e., "I have no assets to pay the judgment") is unavailable to Costa because the impossibility is self-created. The quitclaim deed transfer

---

[1]     FINRA is the Financial Industry Regulatory Authority. It is a private American corporation which acts as a self-regulatory organization which regulates member brokerage firms and exchange markets. The Undersigned takes judicial notice of FINRA's website, where it explains that it is "authorized by Congress to protect America's investors by making sure the broker-dealer industry operates fairly and honestly." https://www.finra.org/about (last visited Sept. 27, 2021). The website further explains that FINRA "oversee[s] more than 624,000 brokers across the country – and analyze[s] billions of daily market events." *Id.*

of Costa's home is, the SEC says, an illustration of an effort to purposefully strip himself of assets in order to avoid paying the judgment. According to the SEC, Costa could have used his pre-transfer interest in the home to satisfy the disgorgement order balance.

But Costa contends that the SEC's theory is fundamentally flawed because it incorrectly assumes that he could have compelled his wife to use the entireties property to fund the required payment. According to Costa, entireties property is exempt under state law and, as a result, a creditor holding a judgment against one spouse cannot force the other spouse to sell the property or to take steps to extract money from the property (such as obtaining a loan in exchange for a mortgage on entireties property). Costa also notes that the disgorgement order was not even in effect when the home was transferred in December 2017. And he says the transfer was done for a legitimate purpose: estate planning.

The SEC has two responses to those arguments. First, it argues that Costa knew that a judgment/disgorgement order was imminent because of the SEC-filed lawsuit against Woodbridge, which occurred two days before the transfer. Second, it posited that the SEC is not like a garden-variety creditor. Thus, the SEC says, courts have equitable powers to reach assets otherwise protected by state law to satisfy SEC disgorgement obligations.

In fact, the SEC argued (at the hearing) that it would have taken the same position even if Costa and his wife had not transferred the home to his wife's trust -- because

entireties property otherwise protected under state law can be reached to satisfy the federal court disgorgement obligation. In other words, the SEC describes itself as a super-creditor, immune from the exemptions which would prevent other types of creditors from executing on property exempt from collection under state law.

The SEC also challenged Costa's explanation that the quitclaim deed transfer was an innocuous estate-planning tool, pointing to his prior under-oath false statement in the bankruptcy proceeding and his testimony that an earlier and similar transfer of a condominium was done to dodge likely creditors.

### i. Post-R & R Developments

On June 15, 2021, Wendy Costa, as Trustee of the Wendy Costa Revocable Living Trust, executed a quitclaim deed, transferring the property back to herself and Costa, as husband and wife. [ECF No. 54-1]. The SEC does not dispute that this transfer created a tenancy by the entireties ownership.

The SEC took Mrs. Costa's deposition on July 22, 2021. [ECF No. 58-3]. It did not ask her any questions about the initial transfer of the residential property into her trust or the more-recent transfer back to entireties property (i.e., to her and her husband).

The SEC also took Costa's deposition the following day. [ECF No. 58-4]. The SEC asked Costa what steps he had taken to satisfy the judgment entered against him. He explained that he receives a limited amount of Social Security and that he is trying to set up a separate account if he has any money left over every month to put towards paying

down the judgment. He also explained that he asked his wife to put up the money but "she adamantly said there's no way she's putting it up." *Id.* at p. 38.

Costa testified he would like to work and use part of his income to pay the judgment but explained that he has severe rheumatoid arthritis, is disabled, is in pain and is on a very expensive biologic to keep it under control. He further noted that the disease has greatly shortened his life expectancy. *Id.* He said he cannot stand for long periods of time and sees a rheumatologist every three months for drug therapy. *Id.* at pp. 41-42.

Costa was asked questions about the transfer of the home back from his wife's trust to him and his wife. He provided the following answer:

> Okay. My answer would be we -- my wife and I were not trying to hide assets of our house by doing this. The reason that that was implemented in 2017 to put the house in the -- in her trust was clearly for some reasons completely different than hiding it from the SEC. It was to -- I had a son that was going through a divorce starting proceeding.
>
> I had a daughter that was -- had just gotten married, and my wife and I were paranoid at the time because that asset was supposed to be put in the trust in 2016 when the apartment, our apartment, her apartment was put into the trust, and somehow it didn't happen with the house. That's why we did it there.
>
> We were trying to think forward if both of us were killed, or one of us was killed or both of us were killed, that that money would be thrown into a marriage dispute with my son, and that would have been, you know, considered his asset and lost to his ex-wife.
>
> And also to protect our daughter. It was really a -- it was -- it was asset protection. It wasn't asset -- we weren't trying to hide assets. And the reason we put it back into joint name was because we presumed the house was

always protected, and we weren't trying to -- we weren't trying to hide anything from you. So we put it back in the way it was before December 2017.

*Id.* at pp. 39-40.

At the recent hearing, Costa's counsel explained that Mrs. Costa was mortified to read that the R & R portrayed the transfer to her trust as a tactic to prevent the SEC from collecting on its anticipated judgment, and she therefore decided to return the property to the way it was before the SEC filed its lawsuit. She used the same type of document used to accomplish the original transfer (i.e., a Quit Claim Deed).

## II.   Applicable Legal Principles and Analysis

Because the Subject Property was transferred back to Costa and his wife "as husband and wife," a tenancy by the entireties was created. *Beal Bank, SSB v. Almand & Assocs.*, 780 So. 2d 45, 54 (Fla. 2001) (holding that "[w]here real property is acquired specifically in the name of a husband and wife, it is considered to be a "rule of construction that a tenancy by the entireties is created"); *see also Roberts-Dude v. JP Morgan Chase Bank, N.A.*, 498 B.R. 348, 355 (S.D. Fla. 2013) ("[W]here a deed is titled in the name of two people as husband and wife—even if the deed does not use the phrase 'tenancy by the entirety'— the estate is a tenancy by the entirety, and it matters not what extrinsic evidence may exist of the husband and wife's contrary intentions in titling the deed in their names as husband and wife.").

*Beal Bank* explained the distinction between spouses owning property in a tenancy by the entireties and spouses owing property held as a joint tenancy with right of survivorship:

> if property is held as a joint tenancy with right of survivorship, a creditor of one of the joint tenants may attach the joint tenant's portion of the property to recover that joint tenant's individual debt. However, when property is held as a tenancy by the entireties, only the creditors of **both** the husband and wife, jointly, may attach the tenancy by the entireties property; the property is not divisible on behalf of one spouse alone, and therefore it cannot be reached to satisfy the obligation of only one spouse.

780 So.2d at 53 (emphasis added) (internal citation omitted).

As a result, the ownership status of the Subject Property is exactly the same now as it was before the original transfer -- a status created nearly forty years earlier, when the couple originally purchased the Subject Property as a married couple in 1980. [ECF No. 49-2 (Quitclaim Deed dated December 23, 2017 (conveying the Subject Property by "Andrew Costa and Wendy Costa, husband and wife," "as Grantors," to the Wendy Costa Revocable Trust as "Grantees"))].

As noted, the SEC implicitly concedes that the recent transfer created a tenancy by the entirety ownership between Costa and his wife. The SEC previously explained that it would have *still* sought the same type of contempt relief had the property remained in its entireties ownership and not been transferred to Mrs. Costa's trust.

My initial R & R noted that "[i]f Costa cannot convince his spouse to **return** [the Subject Property] to him (and to her, as a joint owner), then that is a problem of his own

making and the Undersigned recommends that he be held in contempt of court if he does not take steps to use what was his half share in the $1.9 million home to pay the disgorgement order in 90 days." [ECF No. 50, pp. 25-26 (emphasis supplied)].

Costa has now either caused that transfer (by persuading his wife to execute the Quit Claim Deed) or is the beneficiary of his wife's own, unilateral decision to transfer the property back to both of them. Either way, however, the reality is that the circumstances have changed.

Therefore, the current issues are (1) whether the Court has the legal *authority* to issue a contempt order if Costa did not compel or persuade his wife to give up her entireties ownership in the property, and (2) *should* the Court exercise that discretionary power under the unique facts presented here.

It is well settled that a "defendant should always be given an opportunity to show that changed circumstances would make holding him in contempt unjust." *U.S. Commodity Futures Trading Comm'n v. Escobio*, 946 F.3d 1242, 1255, n.12 (11th Cir. 2020).

Here, the Second Transfer caused the Subject Property to be transferred to the ownership of Costa and his wife jointly as husband and wife, exactly the status as the real estate was in before the original transfer. Therefore, any possible prejudice or "problem" that may have resulted from the original transfer has been remedied. Further, even assuming that Costa's participation in the original transfer was "a problem of his own

making," that problem no longer exists because the Subject Property is exactly as available (or not available) now as it was before the original transfer.

Costa argues that he has no means by which to pay the judgment (and thereby avoid the punitive imprisonment effects of a contempt order) other than to persuade his wife to voluntarily give up her entireties ownership interest in the house by selling the home to obtain the proceeds necessary to pay Costa's judgment.

Now that Costa's recent deposition testimony has been submitted, he contends that there is now record evidence that he has no additional assets owned by him to satisfy the judgment because he has no assets. Costa notes that all of his assets were already forfeited to the Woodbridge trustee and that he lost his own life savings when he settled the Woodbridge trustee's claims against him. [ECF No. 58-4, p. 38].

Framed by this reality, Costa contends that the SEC is now, for all intents and purposes, arguing, in effect, that he "must convince his wife to sell the Subject Property in order to satisfy the Judgment against her husband." [ECF No. 59, p. 5]. He contends that this approach is contrary to Florida law, not supported by case law in this Circuit (with the exception of one factually distinguishable, extreme case) and violative of both the Due Process and Takings Clauses of the Fifth Amendment to the United States Constitution.

There is "no question" that courts have inherent power to enforce compliance with their lawful orders through civil contempt. *Shillitani v. United States*, 384 U.S. 364, 370

(1966). Civil contempt is remedial; the penalty serves to enforce compliance with a court order or to compensate an injured party. *See In re Stewart*, 571 F.2d 958, 963 (5th Cir. 1978); *In re Rumaker*, 646 F.2d 870, 871 (5th Cir. 1980). In a civil contempt proceeding, the petitioning party bears the burden of establishing by "clear and convincing" proof that the underlying order was violated. *Newman v. Graddick*, 740 F.2d 1513, 1525 (11th Cir. 1984); *Piambino v. Bestline Products, Inc.*, 645 F. Supp. 1210, 1213 (S.D. Fla. 1986).

However, once the moving party makes a prima facie showing that the court order was violated, the burden of production shifts to the alleged contemnor to show a "present inability to comply that goes 'beyond a mere assertion of inability. . .'" *Combs v. Ryan's Coal Co., Inc.*, 785 F.2d 970, 984 (11th Cir. 1986) (quoting *United States v. Hayes*, 722 F.2d 723, 725 (11th Cir. 1984)); *see also United States v. McAnlis*, 721 F.2d 334, 337 (11th Cir. 1983), *cert. denied*, 467 U.S. 1227 (1984).

In order to show that compliance with a court's order was impossible, the alleged contemnor must go beyond a mere assertion of inability and establish that he or she made "all reasonable efforts" to meet the terms of the court order. *Commodity Futures Trading Comm'n v. Wellington Precious Metals, Inc.*, 950 F.2d 1525, 1529 (11th Cir. 1992) (affirming order denying motion to terminate contempt order and release contemnor from prison for failing to comply with disgorgement order). The "all reasonable efforts" requirement is strictly construed; it is insufficient to show that efforts were merely "substantial,"

"diligent," or in "good faith." *Id.* Moreover, a defendant's subjective beliefs or intent are irrelevant to the question of contempt. *F.T.C. v. Leshin,* 618 F.3d 1221, 1233 (11th Cir. 2010).

Given these standards, a showing that the defendant was unable to pay the *entire* restitution award is insufficient to avoid contempt; instead, the defendant must show an inability to pay *any portion* of the amount in question. *S.E.C. v. Greenberg,* 105 F. Supp. 3d 1342, 1353 (S.D. Fla. 2015) (Hurley, J.).

Therefore, the focus of the court's inquiry in civil contempt proceedings is not on the subjective beliefs or intent of the alleged contemnors in complying with the order, but whether in fact their conduct complied with the order at issue. *See Jim Walter Res., Inc. v. Int'l Union, United Mine Workers of Am.,* 609 F.2d 165, 168 (5th Cir. 1980). Conduct that evinces substantial, but not complete, compliance with the court order may be excused if it was made as part of a good faith effort at compliance. *Newman,* 740 F.2d at 1524; *see also Howard Johnson Co., Inc. v. Khimani,* 892 F.2d 1512, 1516 (11th Cir. 1990).

Therefore, under the Eleventh Circuit's case law, the alleged contemnor may avoid a contempt finding by showing an inability to comply or a good faith effort to comply. *Howard Johnson Co., Inc.,* 892 F.2d at 1516, *see also United Student Aid Funds, Inc. v. Gary's Grading & Landscaping,* No. 6:07-cv-1140, 2009 WL 161711 (M.D. Fla. Jan. 21, 2009).

While inability to pay is a defense to civil contempt, inability to pay is not a defense if the contemnor **created the inability**. *See, e.g., Hodgson v. Hotard,* 436 F.2d 1110, 1116 (5th Cir. 1971); *Piambino,* 645 F. Supp. at 1215; *see generally S.E.C. v. Solow,* 682 F. Supp. 2d 1312

(S.D. Fla. 2010), aff'd 396 F. App'x. 635 (11th Cir. 2010) (summarizing case law authority for rule that contempt defense of impossibility is unavailable if the contemnor created the inability and finding that broker could not successfully invoke the impossibility defense).

Disgorgement is an equitable remedy designed to deprive a wrongdoer of his unjust enrichment and to deter others from violating the securities laws. *S.E.C. v. Gane*, No. 03-cv-61553, 2005 WL 90154, at *19 (S.D. Fla. Jan. 4, 2005) (citing *S.E.C. v. First City Fin. Corp. Ltd.*, 890 F.2d 1215, 1230 (D.C. Cir. 1989)). A disgorgement order is more like an injunction for the public interest than a money judgment. *See S.E.C. v. Huffman*, 996 F.2d 800, 802-03 (5th Cir. 1993); *see also Steffen v. Gray, Harris & Robinson, P.A.*, 283 F. Supp. 2d 1272, 1282 (M.D. Fla. 2003), *aff'd sub nom. Steffen v. Gray, Harris & Robinson*, 138 F. App'x. 297 (11th Cir. 2005). Disgorgement is not precisely restitution; it wrests ill-gotten gains from the hands of a wrongdoer. *See S.E.C. v. Huffman*, 996 F.2d at 802. It is this feature, the similarity to an injunction, that allows disgorgement orders, unlike judgments, to be enforced by civil contempt. *Id.* at 802–03.

In the instant case, the SEC argued that Costa created his own inability to pay by transferring the property to his wife's trust. The Undersigned agreed with that position in the initial R & R. But the circumstances have changed. Costa's wife transferred the property back to its pre-transfer status.

Thus, although Costa argues that entireties property is exempt,[2] even from the SEC when it is enforcing a disgorgement action, the entireties property was created forty years earlier and had nothing to do with an effort to prevent the SEC from collecting on a disgorgement judgment. Thus, the current status of the property is no longer in a self-created inability to pay scenario. However, for reasons outlined below, the Undersigned is not inclined to completely reject Costa's position that the Court has no authority to compel payment from entireties property when enforcing an SEC disgorgement order.

There is little doubt that this Court has broad equitable powers to reach assets otherwise protected by state law to satisfy a disgorgement order. *See S.E.C. v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1103 (2d Cir. 1972) ("Once the equity jurisdiction of the district court has been properly invoked by a showing of a securities law violation, the court possesses the necessary power to fashion an appropriate remedy.").

For example, a district court can ignore state law exemptions as well as other state law limitations on the ability to collect a judgment in fashioning a disgorgement order. *See Huffman,* 996 F.2d at 803 (holding that disgorgement is not a "debt" under the Federal Debt Collection Procedures Act, and defendants could not avail themselves of the state

---

[2]     At the recent hearing, Costa noted that "exempt" is technically not an appropriate word to use here. Instead, he said that the unavailability of entireties property from collection under state law is merely an aspect of a tenancy by the entireties, as opposed to being an exemption. For purposes of this R & R, however, it does not matter whether it is the inherent nature of entireties property or an exemption which renders it generally immune from creditors' efforts to compel one spouse to sell his or her share in order to help pay a judgment owed by the other spouse.

law exemption under the Act); *S.E.C. v. AMX, Int'l, Inc.*, 872 F. Supp. 1541, 1544-45 (N.D. Tex. 1994) (declining to take homestead exemption into account); *S.E.C. v. Musella*, 818 F. Supp. 600 (S.D.N.Y. 1993) (holding exemptions from attachment under New York law did not alter a person's duty to pay under a disgorgement order); *see also Pension Benefit Guar. Corp. v. Ouimet Corp.*, 711 F.2d 1085, 1093 (1st Cir. 1983) (ignoring state law limitations on alter ego theory in ERISA context).

Moreover, in *S.E.C. v. Hickey*, 322 F.3d 1123 (9th Cir. 2003), the Court held that the district court's broad equitable powers to reach third parties to effect orders in securities fraud enforcement actions allowed it to freeze a corporation's assets, even when there was no alter ego relationship under California law. The *Hickey* court stated the following:

> We do not think that state law limitations on the alter ego theory or doctrine are necessarily controlling in determining the permitted scope of remedial orders under federal regulatory statutes. Instead, federal courts have inherent equitable authority to issue a variety of ancillary relief measures in actions brought by the SEC to enforce the federal securities laws.

*Id.* at 1131 (internal citations and quotations omitted). The court additionally stated:

> The necessity of the district court's asset freeze is demonstrated by the total and complete control that Hickey exercised over the Brokerage, and by the fact that Hickey's only source of income was the money that he ordered paid to himself through the Brokerage from the assets frozen by the court's order.

*Id.*

However, there may be uncertainty over the Court's ability to enforce an SEC disgorgement order against *entireties* property in the Eleventh Circuit.

**First**, in cases not involving the SEC's enforcement activities in seeking to collect on a disgorgement order, the Eleventh Circuit has upheld the state law doctrine that an innocent spouse cannot be forced to relinquish her entireties right in real property to satisfy a judgment or effectuate a forfeiture.

In interpreting Florida's state law, the Eleventh Circuit has long recognized that under the "state's law governing entireties property, 'neither spouse may sever or forfeit any part of the estate without the assent of the other.'" *United States v. Fleet*, 498 F.3d 1225, 1227 (11th Cir. 2007) (quoting *Sitomer v. Orlan*, 660 So.2d 1111, 1113 (Fla. 4th DCA 1995)). In particular, the Eleventh Circuit has held that the Supremacy Clause of the United State Constitution (Art. VI, Cl. 2) provides that federal law may preempt state property law **only** when the United States Congress has manifested an intention to do so. *See Fleet*, 498 F.3d at 1227. "If, however, Congress did not intend for federal law to preempt state law, then there is no conflict and **state law is to be honored** in applying the federal law." *Id.* (emphasis supplied).

As a result, it is well settled that, even when enforcing a civil forfeiture against a criminal spouse, a district court may not disregard Florida's well settled protection for an innocent spouse's entireties property. *See, e.g., United States v. One Single Fam. Residence With Out Buildings Located at 15621 S.W. 209th Ave., Miami, Fla.*, 894 F.2d 1511, 1512, 1517 (11th Cir. 1990) (hereinafter "*15621 S.W. 209th Ave.*") (finding that no portion of property held in a tenancy by entirety by an innocent spouse could be forfeited "because we see

no way for the government to obtain a meaningful share in an entireties property without forfeiting some part of the innocent spouse's interest"); *Baldwin v. United States*, 805 F.Supp. 1026, 1030 (S.D. Fla. 1992) (holding that forcing a spouse to relinquish her entireties right to satisfy a criminal fine would be a "Fifth Amendment taking"); *United States v. Prop. Entitled in Names of Alexander Morio Toki & Elizabeth Mila Toki*, 779 F. Supp. 1272, 1282 (D. Haw. 1991) (holding that "U.S. cannot forfeit [the defendant's] interest in the property if [the spouse] is an innocent owner as long as the tenancy by the entirety exists"); *United States v. One Parcel of Real Est. Located at 9818 S.W. 94 Terrace, Miami, Dade Cty.*, Fla., 788 F. Supp. 561, 564 (S.D. Fla. 1992), *aff'd sub nom. United States v. One Parcel of Real Est.*, 983 F.2d 1083 (11th Cir. 1993) ("[N]o portion of property held in tenancy by the entirety by an innocent owner and her spouse who was involved in a narcotics transaction can be forfeited.").

Therefore, at least in non-SEC cases, our Circuit has acknowledged in myriad scenarios that federal courts cannot ignore a state's property law protecting entireties property when there is no federal statue permitting the practice. The Eleventh Circuit provided guidance on this point in *McGregor v. Chierico*, 206 F.3d 1378, 1385 (11th Cir. 2000):

> This court has already determined that severance of a tenancy by the entirety for the purpose of taking the property owned by a guilty spouse, works a partial taking of the innocent spouse's property. *See United States v. One Single Family Residence*, 894 F.2d 1511, 1515 (11th Cir.1990). The partial taking results from the fact that "[a] tenant by the entireties holds an indivisible right to own and occupy the entire property." *Havoco of Am., Ltd.*

> *v. Hill*, 197 F.3d 1135, 1139 (11th Cir. 1999) (internal quotations omitted). To convert that right to own and occupy into a tenancy in common **would effect an unlawful taking**. *See* [*U.S. v. One Single Family Residence With Out Buildings Located at 15621 S.W. 209th Ave., Miami, FL* 894 F.2d 1511, 1516 (11th Cir. 1990)].

*Id.* (emphasis supplied) (citations, punctuation and parentheticals in original).

Further, it is clear that in the bankruptcy context, property held as tenants by the entirety cannot be divided to satisfy the debts of the debtor spouse. *See In re Sinnreich,* 391 F.3d 1295 (11th Cir. 2004) (finding that property owned by a Chapter 13 bankruptcy debtor as tenancy by the entireties with a non-debtor under Florida law was not part of the bankruptcy estate and therefore was exempt from bankruptcy administration).

**Second**, although the SEC argues that it is entitled to remedies unavailable to other types of creditors when it is enforcing a disgorgement order for the ultimate benefit of the victims, the circumstances under which the federal government is otherwise unable to obtain entireties property are often more extreme than the scenario at issue here.

For example, *Fleet* involved a forfeiture judgment following a criminal conviction for money laundering. That would seem to generate a more-compelling ground to *permit* the government to collect against entireties property than the instant case, which involves a disgorgement consent judgment in a civil action where the defendant is not being criminally prosecuted. Nevertheless, the *Fleet* Court held that, absent an express preemption of state law by Congress, federal courts may *not* reach property owned by a convicted defendant's spouse. 498 F.3d at 1231 (distinguishing the criminal and civil

forfeiture statutes, the latter of which does not allow for forfeiture by an innocent spouse who owns property with the defendant in the entireties).[3]

Similarly, the Court in *One Parcel of Real Est. Located at 9818 S.W. 94 Terrace* involved a spouse whose tenancy by the entirety interest could not be forfeited even when her husband was involved in a narcotics transaction.

If federal courts cannot forfeit entireties property in civil forfeiture actions when the spouse was involved in substantial criminal activity, then policy reasons suggest that a similar result should govern here, where the culpable spouse (Costa) was *not* accused of criminal violations.

**Third,** The Eleventh Circuit's ruling affirming an Order ruling in the SEC's favor on an entireties property contempt matter is a two-paragraph opinion which does not analyze a court's ability to compel a spouse to divest her entireties property and find the judgment debtor in civil contempt and ordering his incarceration until he purges his contempt. *See S.E.C. v. Solow*, 396 F. App'x. 635 (11th Cir. 2010).

The *Solow* Court explained that the S.E.C. established a prima facie case of civil contempt at the trial court's show cause hearing -- i.e., that Solow actively took steps to create his asserted inability to pay. The appellate court noted that Solow, in response,

---

[3]     Although a federal statute preempting Florida's protection for entireties property applied in *Fleet*, there is no such statute available here (and the SEC has not argued to the contrary). The federal statute applicable in *Fleet*, 21 U.S.C. § 853, is specifically limited to property **obtained** illegally. That has no bearing here, where Costa and his wife purchased the home decades before he was involved with Woodbridge.

testified that, among other things, his only asset is his interest in homestead property held with his wife as tenants by the entirety, and he lacked the ability to coerce the sale of the property. As highlighted by the appellate court, the trial court found Solow's testimony "not credible" and that rather than making in good faith all reasonable efforts to comply with the disgorgement order, Solow had been frustrating compliance. The *Solow* Court concluded this succinct history by noting that "the district court's credibility finding is well supported in the record." *Id.* at 635.

Given this comparatively sparse discussion by the appellate court, the Undersigned cannot fairly conclude that the Eleventh Circuit clearly and unequivocally held that the SEC can routinely enforce disgorgement orders by obtaining civil contempt orders entered merely because one spouse could not convince the other (innocent) spouse to give up an entireties property interest.

**Fourth**, the trial court order affirmed by the Eleventh Circuit, *S.E.C. v. Solow*, 682 F.Supp.2d 1312 (S.D. Fla. Jan. 15, 2010) ("*Solow I*"), recognized that "[u]nder Florida law, property held by tenancy by the entirety is exempt from process to satisfy the individual obligations of either spouse, but may be reached only by a joint creditor of both spouses." *Solow I*, 682 F.Supp.2d at 1331 (citing *In re Droumtsekas,* 269 B.R. 463 (Bankr. M.D. Fla. 2000)). To be sure, the trial court there explained that enforcement of a disgorgement order has been treated differently by courts from enforcement of a judgment. Nevertheless, the judge recognized the fundamental protection afforded property held

by the entireties but noted the existence of a "campaign of asset dissipation," an extreme scenario not present here. *Id.* at 1332.

**Fifth,** the facts in *Solow I* are markedly different than the ones here, and that makes the case easily distinguishable. Specifically, the *Solow I* Court noted that (1) Mrs. Solow (the non-debtor spouse) had hired asset protection attorneys to "strip the equity from the only asset Mr. Solow testified he has," (2) a "fanfare of asset protection activities took place, (3) the myriad asset protection activities occurred after the jury verdict, (4) jewels were taken to Switzerland, (5) the equity "stripped from the tenancy by the entirety [was] to placed in trust in the Cook Islands, (6) Mrs. Solow had "many luxury homes, bought through the proceeds of Mr. Solow's business activities," (7) the Solows "worked very hard" to give their assets an opaque appearance, such as incorporating the family car and the family home, (8) the Solows have multiple trusts and accounts, both foreign and domestic, (9) the couple had added "layers of complexity" to their assets, and (10) Solow consented to sending his "joint assets outside of his control and to the other side of the globe." *Id.* at 1332-33.

The appellate court (i.e., *Solow II)* did not mention these facts at all in its brief discussion of the case.

In the instant case, of course, the residential home was not purchased with proceeds from the Woodbridge scheme or Costa's payments from his involvement as a salesman, the couple had not been involved in a "fanfare" of asset activities, the family

home had been held by the entireties for decades and the SEC did not introduce evidence establishing that Costa and his wife had added layers of complexity to their assets.

In a memorandum, Costa distinguishes *Solow I* by describing it as based on "peculiar circumstances" which "effectively made the judgment debtor's spouse something akin to a 'partner in crime' with the actual debtor." [ECF No. 59, p. 8]. The Undersigned agrees with that categorization and concludes that the record evidence here does not prove that Mrs. Costa was a partner in crime. To the contrary, the only significant step she took which could be deemed an asset-protection activity -- transferring the home from entireties property to her trust -- was undone when she transferred the property back to its pre-R & R status.

**Sixth**, *Solow I*, a district court opinion, is not binding authority. Indeed, it is not even binding on the district judge who issued it. *See, e.g., Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case.").

Therefore, to the extent that the SEC relies upon *Solow I*, the SEC is relegated to arguing that the case might be persuasive, but is not binding. Likewise, the appellate court case (i.e., *Solow II)*, is not binding, as it was not selected for publication in the Federal Reporter. *See generally Eleventh Circuit Rule 36-2* ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

Moreover, given the abbreviated discussion and the lack of discussion concerning entireties property, it would be a stretch to conclude that the holding in *Solow II* authorizes the enforcement of an SEC disgorgement order against an innocent spouse holding an entireties interest in her home.

**Seventh**, the *Solow I* Court distinguished *Chierico* in a way which does not help the SEC here. In particular, the Court held that *Chierico*, where the Eleventh Circuit held that a homestead held by a tenancy in the entirety could not be reached in a contempt proceeding because the wife was completely innocent party to the alleged action that constituted contempt, expressed concern over forcing the wife to relinquish the family home. The *Solow I* Court explained that the case before it was "distinguished in that there is no *one* 'family home' to be protected." 682 F. Supp. 2d at 1332 (emphasis supplied).

In *Solow I,* the defendant's wife lived in a luxury condominium in Fort Lauderdale owned by a company in which she has a 100% interest and also owned a residence in Park City, Utah, a mountain resort town. Thus, the purportedly innocent spouse in *Solow I* was not innocent at all, but, rather, was, in effect, a co-conspirator. The same cannot be said here about Mrs. Costa.

**Eighth**, another Florida district court case, albeit also non-binding (like *Solow I)* but also involving the SEC, provides support for the rule that a court deciding whether to use its equitable powers to enforce a disgorgement order against entireties property

should use a fact-specific perspective and not automatically conclude that the protection for such property is unavailable.

Specifically, *SEC v. Yun*, 208 F. Supp. 2d 1279 (M.D. Fla. 2008), supports Costa's view that the entireties status of the residential property, combined with the absence of the types of extreme circumstances present in *Solow I*, should not support a contempt order against him merely because he could not convince his wife to give up her ownership share in their family home. The *Yun* Court refused to force the defendant to disgorge her home because she owned it with her husband as a tenant by the entirety. After noting that Florida law provides that one spouse cannot alienate or encumber an estate without the other's consent, the Court explained that "Yun does not truly own her home or have the sole power to encumber it." 208 F. Supp. 2d at 1284, n.7.

In *Yun*, the Court held that a Florida home owned by a tenancy in the entireties could not be used to satisfy a disgorgement judgment, while other jointly held property could. Unlike property which is merely owned jointly, the Costas' residential property cannot be severed without violating Mrs. Costa's legally protected ownership of the *entire* property.

For purposes of this Amended R & R, the Undersigned will assume without deciding that a district court may in certain circumstances exercise its discretion by using its broad equitable power to reach assets otherwise protected by state law to satisfy a disgorgement order in the SEC's favor, which serves different purposes than a judgment.

For the reasons outlined above and summarized below, the Undersigned concludes that this Court should not use that power here to reach the Costa's entireties-owned home.

At bottom, *Solow I* is a narrow, fact-specific exception to the rule established in *Chierico* and other Eleventh Circuit cases, including cases upholding the protection in the face of criminal activity such as drug-dealing.

Here, unlike in *Solow I*, Costa still lives with his wife in the same home they have lived in together for the last forty years, whereas Solow's wife lived in two different luxury residences, one in Fort Lauderdale and one in Park City, Utah. And, here (as in *Chierico but* unlike in *Solow*), Costa and his wife were *not* accused of engaging in any widespread "asset protection activities" such as "jewels taken to Switzerland" and assets "placed in trust" in some offshore entity. 682 F. Supp. 2d at 1332-33.

Furthermore, the *Solow I C*ourt specifically found, as a justification for avoiding the rule in *Chierico* that the subject property owned in the entireties with the (not-so) innocent spouse, was purchased using proceeds of the same illegal business activities giving rise to the judgment against the defendant. *Solow I*, 682 F. Supp. 2d at 1332-33 (pointing out that "Mrs. Solow's interest in one of her many luxury homes, *bought through the proceeds at of Mr. Solow's business activities*" (emphasis added)). Nobody alleges that the Costas purchased their home using ill-gotten gains, much less the proceeds of the business activities of Costa related to Woodbridge.

34

In addition, Costa was not convicted of, nor even accused of, securities fraud or similar crime-like activities. And he and his wife were not shown to be engaged in widespread misconduct to shield their assets from the SEC or Woodbridge victims using offshore accounts and international transactions.

Unlike in *Solow I*, Costa did *not* make the transfer to his wife's trust "on the eve of a judgment to avoid the SEC as a creditor." *Id.* at 1332. To the contrary, the transfer took place well more than a year before the judgment -- and nearly a year before settling his claims with the Woodridge trustee.

And here, unlike in *Solow I*, there were no other assets supposedly transferred to anyone, including to Costa's wife, at or near the time of the judgment. Also here, Costa still lives with his wife in the same home they have lived in together for the last forty years, whereas Solow's wife lived in two different luxury residences, one in Fort Lauderdale and one in Park City, Utah.

Likewise, in the instant case, (as in *Chierico*), but unlike in *Solow I*, Costa entered into a consent judgment with the government and was ***not*** found guilty by a jury of any wrongdoing whatsoever. Further, and perhaps most significantly, here, unlike in *Solow I*, Costa and his wife were not accused of engaging in any widespread "asset protection activities" such as "jewels taken to Switzerland" and assets "placed in trust" in some offshore entity. 682 F. Supp. 2d at 1332-33.

Because of the absence in this case of any of the numerous facts indicating wrongdoing on the part of Costa and his wife, the rule in *Chierico*, not the exception to that rule in *Solow I*, applies here.

The Undersigned acknowledges that my initial R & R relied heavily on *SEC v. Bilzerian*, 112 F. Supp. 2d 12 (D.D.C. 2000), but Judge Moreno's referral has caused me to reconsider that reliance, and I now conclude that it is not particularly helpful here because, similar to *Solow I*, it relied on extreme facts not present here. In fact, *Bilzerian* involved even *more* extreme facts than *Solow I*. Focusing on the fact-specific basis of that ruling, the Undersigned now views *Bilzerian* as another example of an *exception* to the *Chierico* rule.

In *Bilzerian* the defendant had previously owned with his spouse a "30,000 square foot mansion in Tampa, Florida" that was transferred to an offshore "Family Trust." 112 F. Supp. 2d at 20. But the defendant had also previously owned multiple other properties (including in other states), millions of shares of stock and also stock options, that had been transferred into a "children's trust." *Id.* at 20-21.

The *Bilzerian* court held that the defendant must convince the trustees of his family trusts to return the assets that were transferred into them, or risk a finding of contempt. *Id.* at 28. Here, by contrast, there is no complicated campaign of asset protection at issue before the Court. To the contrary, there is only the transfer, which was then undone.

Therefore, Costa's case is distinguishable from *Bilzerian* for at least one of the reasons it is distinguishable from *Solow* -- because there were no other factors of bad faith or wrongdoing, especially by Mrs. Costa, that would allow a departure from the *Chierico* rule. Furthermore, nowhere in *Bilzerian* is there any discussion whatsoever about Florida's law which protects entireties property.

## III.    Conclusion

The Undersigned withdraws my initial R & R and substitutes this amended version, and I **respectfully recommend** that Judge Moreno **deny** the SEC's motion for the reasons outlined above.

## IV.    Objections

The parties will have fourteen (14) days from the date of being served with a copy of this Amended Report and Recommendations within which to file written objections, if any, with the District Judge. Each party may file a response to the other party's objection within fourteen (14) days of the objection. Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary, in the interest of justice. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985);

*Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).

**RESPECTFULLY RECOMMENDED** in Chambers, in Miami, Florida, on September 28, 2021.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
The Honorable Federico A. Moreno
All Counsel of Record